No. 48,583

STATE OF KANSAS, *Appellee*, v. MICHAEL E. BURROW and MARK E.
DOHLMAR, *Appellants*.

(561 P. 2d 864)

Opinion filed March 5, 1977.

*Russell Shultz*, of Wichita, argued the cause, and *Richard W. Holmes*, also
of Wichita, was with him on the brief for the appellants.

*Stephen M. Joseph*, assistant district attorney, argued the cause, and *Curt
T. Schneider*, attorney general, and *Vern Miller*, district attorney, were with
him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: Michael E. Burrow and Mark E. Dohlmar were each
convicted of murder in the second degree in violation of K. S. A.
21-3402 at the conclusion of a lengthy jury trial in the district court
of Sedgwick County, and each was sentenced to imprisonment for
not less than fifteen years nor more than life. This is a direct
appeal from those convictions. The sole question presented is
whether the trial court erred in refusing to instruct on lesser in-
cluded degrees of homicide, voluntary manslaughter (K. S. A. 21-
3403) and involuntary manslaughter (K. S. A. 21-3404).

The appellants, along with Hector A. Conde and Edward Stephen
Weser, were charged with conspiracy, aggravated kidnapping, and
first-degree murder. Conde entered a plea of guilty to the included
charge of murder in the second degree and he testified as a witness
for the prosecution. Burrow, Dohlmar, and Weser were tried to-
gether. The jury acquitted them of conspiracy and aggravated
kidnapping but found each guilty of murder in the second degree.
All three appealed; however, Weser escaped from the penitentiary
and during the time he was a fugitive his appeal was dismissed.

We turn now to the bizarre facts disclosed by the record. A
number of young men, including Burrow, Dohlmar, Conde, Weser,
and the deceased, Dennis Lee Plumly, together with several young
women, were living in a house on East Bayley Street in Wichita.

Weser was the unofficial head of the "family," the members of which were heavily involved in the use and sale of drugs. Several members of the family, Weser, Burrow, Dohlmar, Conde, Plumly, and James Smith, went to Cloud County, Kansas, near the city of Concordia, to harvest wild marijuana on Tuesday, September 19, 1972. Burrow, Dohlmar, Weser, and Plumly were arrested by the authorities; Conde and Smith escaped detection and hitchhiked back to Wichita. Weser, Burrow and Dohlmar were formally charged with the possession of marijuana. Plumly was not charged; instead, he was released, and was provided with transportation back to Wichita by various law enforcement agencies. Weser, Burrow, and Dohlmar ultimately posted substantial appearance bonds and were released. The bondsman, Bob Morey, suggested that it would be better if Plumly did not show up during the trial. The members of the family agreed; they concluded that Plumly had "snitched" on them.

Weser, Burrow, and Dohlmar met in a back bedroom of the Bayley Street house on Thursday and decided that they would have to kill Plumly. Conde, Weser, and Dohlmar met on Friday and reached the same conclusion. Weser directed Conde, an expert in karate, to "rough up" Plumly, and he instructed Dohlmar to "shoot him up" (with drugs) and take him out and bury him. Weser would provide some lye to pour on the body.

Early on Saturday evening, Burrow, Dohlmar, Conde, Plumly, and Smith left the Bayley Street house in Burrow's Ford van. They drove to Smith's residence on East Pine. Smith, Conde, and Plumly went into Smith's house; Burrow and Dohlmar drove to the home of friends, borrowed shovels, and returned. Plumly did not appear to be under the influence of drugs when he arrived at Smith's house. Conde struck Plumly three hard blows, twice in the chest and once in the stomach. Burrow and Dohlmar took him to the kitchen and put him in a chair. Dohlmar then dissolved some capsules and drugs in cold water, filled a syringe with the solution, and injected it into Plumly. He prepared a second mixture, and injected that into Plumly. Next, Burrow, Dohlmar, and Conde loaded Plumly into a van and drove to a remote spot where Conde got out and dug a hole. Plumly was still alive but blood was flowing from his mouth and he was going into convulsions. When he died, they put him in the hole face down, poured lye over him, and covered him up. They stripped branches off of a tree, obliterated their footprints, and placed the branches over the grave.

Burrow testified on behalf of himself, Dohlmar, and Weser, and gave a somewhat different version of the events. He claimed that Plumly's death occurred on Friday night. He had known Plumly for a year and a half; he trusted Plumly. Plumly had no reason to snitch on any of them. None of them caused Plumly's death, and if they did cause his death, they did not intend to do so. Burrow said that he, Dohlmar, Conde, Plumly, and Smith were drinking at the Bayley Street house. They all left about 7 o'clock p. m. to get some drugs and on their way dropped Smith, Plumly, and Conde off at Smith's house. Burrow and Dohlmar drove to a park where Dohlmar purchased 50 "reds"—secobarbital capsules of 50 milligrams each. When they returned to Smith's home, Smith and Conde were beating Plumly. He was conscious, but was bleeding from his mouth, his nose, and the back of his head. Burrow and Dohlmar intervened, stopped the beating, and gave aid to Plumly. They helped him to a chair, wiped the blood from his face, and gave him a glass of water. Dohlmar wanted to take an intravenous shot of the barbiturate so he mixed some of the capsules for himself. Plumly saw this. He was nervous and shaky and he asked for a shot. At his request, two of the 50-milligram "reds" were administered to him by Dohlmar. Sometime thereafter, Plumly said that his heart was giving him trouble. This had happened a year or so before, while Burrow and Plumly were living together, and Burrow had taken Plumly to the hospital at that time. Accordingly, on this occasion, they helped Plumly into the van and started to take him to St. Francis Hospital. Burrow was driving, Dohlmar was in the passenger seat, and Conde was with Plumly in the rear of the van. While they were en route to the hospital, Burrow heard a commotion in the back, turned around, and saw that Plumly was completely limp. Dohlmar said that Conde had struck Plumly on the side of the throat with his fist. Dohlmar then proceeded to check Plumly as to breathing and pulse; Conde announced, "You don't need to check him; he's dead." Burrow was then afraid to take Plumly to the hospital because he was badly beaten and bleeding. Conde suggested that they bury him. Burrow then drove to a friend's house and borrowed some shovels. They drove west of Wichita and Conde selected the place for burial. Burrow and Dohlmar dug the grave. Conde dragged Plumly from the van and struck him on the Adam's apple. Both Dohlmar and Conde said that Plumly was dead. Conde rolled the body into the grave, sprinkled something that he got from the van, probably Drano, over the body, and directed

Burrow and Dohlmar to cover it. They covered the grave with shrubbery and grass, and Conde brushed their tracks with a tree limb in order to cover them.

Both defendants asked the trial judge to instruct on voluntary and involuntary manslaughter. The court concluded that the elements of those offenses were not present and denied the requests. Instructions were given only as to murder in the first and second degrees.

K. S. A. 21-3107 (3) makes it the duty of the trial court to instruct the jury not only as to the crime charged, but as to all lesser crimes of which the accused might be found guilty under the information. The court's duty to instruct on lesser degrees under this statute arises only where there is evidence upon which the accused might reasonably be convicted of the lesser offense. *State v. Goodseal,* 220 Kan. 487, 553 P. 2d 279.

As Justice Fontron stated in *State v. Clark,* 214 Kan. 293, 521 P. 2d 298:

"It is the duty of a trial court to instruct the jury not only as to the crime charged specifically in the information but also with respect to such lesser offenses included therein as may be justified by the evidence. The rule is firmly imbedded in our jurisprudence. In *State v. Cunningham,* 120 Kan. 430, 243 Pac. 1006, it is framed in these words:

"'. . . The instructions should cover every issue or theory in the case which has support in the evidence. Whether the evidence tending to support the lower degrees of the offense appears to the court to be weak and unsatisfactory, the accused is nevertheless entitled upon request to have the issue and the effect of the evidence submitted to the jury. . . .' (p. 431.)

"The evidence pointing to a lesser offense of which an accused might rationally be found guilty in a given case need not be strong or extensive to require instructions to the jury with regard thereto. . . . Nor need the trial court be satisfied as to its weight or conclusive character. Long ago this aspect of the rule was given expression in *State v. Buffington,* 66 Kan. 706, 72 Pac. 213:

"'The defendant in a criminal prosecution has a right to have the court instruct the jury in the law applicable to his contention, if it be supported by substantial evidence, however weak, unsatisfactory or inconclusive it may appear to the court. . . . [The test is] whether there is any substantial evidence tending to prove an inferior degree of the offense. If there is, then the question of such degree should be submitted to the jury. The unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court so to instruct.' (pp. 709, 710.)" (pp. 296-299.)

Now we must apply these rules to the evidence in this case. In order to support a conviction of voluntary manslaughter, the evi-

dence must establish that: (1) the defendant killed the victim (in this case, Plumly); (2) that it was done intentionally; and (3) that it was done upon a sudden quarrel or in the heat of passion. K. S. A. 21-3403.

PIK Crim. 56.04 (*e*) (1975 Supp.) defines "heat of passion" as "any intense or vehement emotional excitement which was spontaneously provoked from circumstances." "Intentionally" means purposefully and willfully and not accidentally.

Burrow testified that Conde killed Plumly; that Burrow, Dohlmar, and Weser did not kill him, and did not intend to do so. Entirely lacking from his testimony is any evidence that the killing was done by any of those three upon a sudden quarrel or in the heat of passion. Burrow did not testify that any of the three struck Plumly or took other action which might have caused his death upon any spontaneous emotional excitement. Weser was not present; neither Burrow nor Dohlmar struck Plumly; instead, according to Burrow, both intervened in Plumly's behalf, attempted to assist and comfort him, gave him a mild sedative at his request in an effort to calm his nervousness and shakiness, and were taking him to the hospital when Conde assaulted and killed him. None of the elements of voluntary manslaughter were established by this testimony.

Involuntary manslaughter is defined as:

"[T]he unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. . . ." K. S. A. 21-3404.

Involuntary manslaughter is distinguished from voluntary manslaughter and second-degree murder by the lack of malice and intent to kill. *State v. Wilson,* 215 Kan. 437, 524 P. 2d 224. In that case the defendant contended that he was entitled to an instruction on involuntary manslaughter. The deceased was killed by a fall from the fourth tier of cells in the penitentiary, and Wilson was charged with intentionally causing the fall. The only defense advanced was a denial of the killing; Wilson contended that the deceased fell by accident, and that he was not pushed over the rail by the defendant. We held that the evidence would not support an instruction on involuntary manslaughter.

In *State v. Childers,* 217 Kan. 410, 536 P. 2d 1349, the defendant was charged with second-degree murder. Testimony indicated that Childers fired shots out of a bedroom window and struck the deceased, who was running away from the window during the night-

time. Defendant testified that he was not shooting at any person, but was just shooting into the ground. He had no intention to shoot the deceased. We noted that involuntary manslaughter is distinguished from voluntary manslaughter by the lack of intent to kill. Involuntary manslaughter is a *killing* done unintentionally. We held that the evidence was sufficient to support the defendant's theory that the *killing* was done unintentionally, and thus a jury instruction on involuntary manslaughter was required.

Again, in *State v. Clark*, 218 Kan. 18, 542 P. 2d 291, we examined the evidence in order to determine whether an instruction on involuntary manslaughter should have been given. Clark admitted shooting his wife, but contended that he blacked out temporarily and was not fully aware of what he was doing. We concluded that the evidence was sufficient to support a conviction of involuntary manslaughter, and thus the trial court erred in not giving such an instruction.

The question was again before us in *State v. Gregory*, 218 Kan. 180, 542 P. 2d 1051. We examined the evidence and found that a jury issue was presented as to whether the killing was intentional. Gregory admitted shooting the deceased, but testified that he did not intend to kill him but only "to stop him." We held that it was proper for the trial court to instruct the jury on involuntary manslaughter.

We turn now to the record before us. Burrow testified that neither he nor Dohlmar killed Plumly, nor did they intend or agree to kill him. Weser was not present. Burrow and Dohlmar interceded in Plumly's behalf, stopped others from beating him, gave him a drink of water and Dohlmar gave him an injection of two fifty-milligram secobarbital capsules at his request. Dr. Morton F. Mason, a toxicologist who examined various organs from the deceased's body, stated that he found large concentrations of sodium amytal and sodium secobarbital in these specimens, and that a single therapeutic dosage of secobarbital of 100 to 200 milligrams could not produce the extreme concentrations found.

Dr. William G. Eckert, a pathologist and deputy coroner of Sedgwick County, testified that in his opinion death was caused by an overdose of barbiturates, both amytal and seconal. Thus it is clear from the medical testimony that the small amount of secobarbital which Burrow testified Dohlmar gave the deceased could not and did not cause death.

Appellants in their brief summarize the testimony of Burrow as follows:

"Appellant Burrow testified that Conde killed Plumly. That the intent of Conde was not known by the Appellants and certainly was not agreed to by Appellants and indeed was not the intent of either of these Appellants. He testified that these Appellants did not in fact participate in causing the death of Plumly nor did they intend his death. . . ."

We believe the record fully justifies this summarization. The defense, in short, was that Conde killed Plumly, and that neither Burrow, Dohlmar, nor Weser participated therein. This testimony negates participation in *any* unlawful killing by Burrow, Dohlmar, or Weser. If the jury believed the testimony of Burrow, it could not find Burrow, Dohlmar, or Weser guilty of any offense. The defendants were either guilty of murder, or they were not guilty.

We conclude that the court properly refused to instruct the jury on the lesser offenses of voluntary and involuntary manslaughter.

The judgment is affirmed.