No. 48,698

STATE OF KANSAS, *Appellee,* v. CHARLES R. COOP, *Appellant.*

(573 P.2d 1017)

Opinion filed January 21, 1978.

*Stephen J. Blaylock,* of Woodard, Blaylock & Johnson, of Wichita, argued the cause and *Lee H. Woodard* was with him on the brief for the appellant.

*Stephen M. Joseph,* Assistant District Attorney, argued the cause and *Curt T. Schneider,* Attorney General; *Vern Miller,* District Attorney; and *Richard Ballinger,* Assistant District Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a direct appeal from a jury verdict wherein defendant Charles R. Coop was found guilty of second degree murder (K.S.A. 21-3402). Defendant alleges the trial court erred (1) in not instructing the jury on the lesser included offense of voluntary manslaughter; (2) in allowing the prosecutor to

question the defendant concerning a prior criminal offense; and (3) in failing to suppress the confession made by the defendant to Detective Oakley.

The facts indicate that both the defendant and his wife Helen were heavy drinkers. The defendant missed work the week of September 11, 1975, because of drinking. Around 5:00 P.M. on September 11, 1975, the defendant went to the home of his neighbors, Mr. and Mrs. Herbert Clark, and advised them he thought his wife was dead. He did not want the police to be called. Later, another neighbor joined the group. The defendant stated there was no way he could prove he had not killed his wife. The police were called by a neighbor and the defendant returned home. The police arrived at approximately 5:34 P.M. and discovered Mrs. Coop's body lying face down on the living room floor. There were some signs of a scuffle as a broken candy dish was on the floor and a lamp and ash tray had been overturned. The officers smelled alcohol on the defendant.

The defendant was given the *Miranda* warning, recited part of it back to the officers, and said he understood his rights. The officers stated the defendant was in contact with reality, walked satisfactorily, and gave sensible answers to questions. The defendant was taken to headquarters and was questioned by Detective Oakley. The interview lasted about five hours, with several coffee breaks. The defendant did not request that the interview be terminated, ask for an attorney, nor say he was ill. The defendant said he was sick at his stomach, intoxicated, and that the statement he signed was in the officer's words. The trial court sustained defendant's motion to suppress as to statements made to the officers at the scene but denied as to the confession made to the detective.

The defendant testified at trial that the incident started as follows:

"I remember my wife was sitting in the chair in the front room and we started talking about something. This was pretty faint. I don't really remember well, but I do remember we started talking about something and disagreeing on something, but I don't remember what it was we was even disagreeing on. We wasn't a heated argument, not really what you call actually—maybe not even an argument really. It was just a disagreement on some little thing we was discussing."

The defendant told the detective that he then went to the back porch, picked up a broom, returned and struck his wife with the broom until the handle broke. He then went back to the porch and

returned with a mop. He struck her with this until it, too, broke. Mrs. Coop was then face down on the floor. Defendant sat in a chair next to her and stomped her right side with the heel of his shoe. Around three o'clock in the morning he left to buy liquor. He walked because he felt he was too drunk to drive. When he returned, his wife was still on the floor. Defendant went to bed. Around noon he woke up and his wife was still on the floor. Defendant said her body was warm, that she had a weak pulse, and was breathing lightly. At about 5:00 P.M. he checked her again and decided she was dead. He then went to the neighbors where the police were called.

The autopsy revealed the body had multiple bruises, abrasions; injuries to the skin of the face, neck, chest, abdomen, buttocks; a black eye; and a laceration to the scalp. Her blood contained .208 percent by weight of alcohol. The pathologist testified Mrs. Coop's injuries would probably not have caused death except for lack of attention and the alcoholic content of her blood.

A laboratory investigator testified a large number of whiskey bottles were found in the home. A broken mop handle and fragments of wood similar to the mop handle were discovered near the body. Hair removed from a ring of the deceased was identified as coming from the defendant. The deceased's blood was found under defendant's fingernails as well as on his shoes, shirt, and pants cuff.

The defendant's first claim of error is that an instruction on voluntary manslaughter as a lesser included offense should have been given. The defendant contends that there was sufficient evidence from which the jury could have found that the defendant unlawfully killed his wife without malice, upon a sudden quarrel, or in the heat of passion. Both the defendant and the state requested a voluntary manslaughter instruction. The defendant relies heavily on State v. Clark, 218 Kan. 18, 542 P.2d 291 (1975), for support of his position. In the Clark case the defendant testified that his wife was very upset and wanted a divorce. She pointed a gun at him and fired. He grabbed for a gun that was under the bed. He did not remember shooting the gun.

In Clark we held:

"It is the duty of the trial court to instruct the jury as to all lesser included offenses of the crime charged that the evidence may justify, even though the evidence of the lesser offense is not strong or extensive, as long as the evidence presents circumstances from which such lesser offense might reasonably be

inferred. The unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court to so instruct." (Syl. 1.)

The lesser included offense in *Clark* was involuntary manslaughter as opposed to voluntary manslaughter, the requested instruction herein.

"Heat of passion" was defined and analyzed in the recent case of *State v. Ritchey*, 223 Kan. 99, 573 P.2d 973. Therein we held:

" 'Heat of passion' includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror. It must be of such a degree as would cause an ordinary man to act on impulse without reflection.

"The emotional state constituting 'heat of passion' must arise from circumstances constituting sufficient provocation. Whether the provocation is sufficient to cause an ordinary man to lose control of his actions and his reason is a question for determination by the trier of fact.

"The test of the sufficiency of the provocation is objective, not subjective." (Syl. 1, 2, and 3.)

The defendant further contends that "heat of passion" and "sudden quarrel" are separate and should each be considered on its own merits. It is the position of the defendant that, even if sufficient provocation is lacking to meet the test for "heat of passion," he was entitled to a voluntary manslaughter instruction because of evidence of a "sudden quarrel." This issue has not previously been before this court.

"Sudden quarrel" per se did not arise from the common law definition. Manslaughter required only "heat of passion" or "hot blood," etc. See generally, 1 Wharton's Criminal Law and Procedure (Anderson) §§ 274-275; Perkins on Criminal Law, pp. 52-54, 56 (2nd ed.). The Kansas wording apparently comes from the federal statute:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"Voluntary—*Upon a sudden quarrel or* heat of passion.

"Involuntary—. . . ." (18 U.S.C. § 1112 [a] [emphasis added].)

For the moment, if we use words such as "sudden combat" and "sudden affray" to have similar meanings as "sudden quarrel," we see that for the most part it is not truly a separate creature. It is merely one of the means of provocation which brings on heat of passion. 1 Wharton at § 280; Perkins at 57-59; 40 Am. Jur. 2d, Homicide, § 61; 40 C.J.S., Homicide, § 42. ". . . a sudden combat is ordinarily considered on the same footing as other

provocations operating to create such passion as temporarily to unseat the judgment." (40 C.J.S., Homicide, § 43, p. 904.)

A few jurisdictions have made affray or quarrel a part of the statutory language. *E.g.,* 18 U.S.C. § 1112 (a); Calif. Penal Code § 192; K.S.A. 21-3403.

In spite of the "or" wording in the statutes mentioned and in the case law of other jurisdictions, only one jurisdiction has treated the terms separately. In Kentucky the case law definition of manslaughter included "in a sudden affray, or in heat and passion."

"The words 'in sudden affray' are not synonymous with the words 'in sudden heat and passion.' " (*Violett v. Commonwealth,* 24 Ky. L. Rptr. 1720, 72 S.W. 1 [1903]; accord, *Burris v. Commonwealth,* 308 Ky. 145, 213 S.W.2d 1014 [1948] [indictment only charged "sudden affray," instruction on "heat and passion" improper].)

However, the effect of the Kentucky case law rule has been modified by the spirit of new civil procedure allowing amendment of indictment. (*Robards v. Commonwealth,* 419 S.W.2d 570 [Ky. 1967].) Also, Kentucky now has a statutory definition of manslaughter using the term "extreme emotional disturbance." Ky. Rev. Stat. § 507.030.

There is one California case which gives the appearance of treating the two terms separately, as in Kentucky:

"Voluntary manslaughter is the unlawful killing of a human being, without malice, upon a sudden quarrel or heat of passion. The law requires the existence of but one of these conditions, as provocation to reduce a felonious homicide from murder to manslaughter. When a mortal blow is struck upon a sudden quarrel or in the heat of passion, upon adequate provocation, the actual intent is disregarded. . . ." (*People v. Ross,* 34 Cal. App. 2d 574, 579, 93 P.2d 1019, 1022 [1939].)

However, this case is not further cited for that proposition and subsequent California cases have mixed the terms (*infra*).

The Kentucky "sudden affray" is defined as "a difficulty or fight suddenly resulting from a mutual agreement of two or more parties." *Burris v. Commonwealth,* 308 Ky. 145, 213 S.W.2d 1014 (1948).

"Mutual Combat—One into which both the parties enter willingly or voluntarily; it implies a common intent to fight, but not necessarily an exchange of blows. [Citations omitted.]" Black's Law Dictionary, 332-333 (Revised 4th ed. 1968) (under "Combat").

"Quarrel," standing alone, has been defined in a general sense:

"In an untechnical sense, it signifies an altercation, or angry dispute, an exchange of recriminations, taunts, threats or accusations between two persons. [Citations omitted.]" Black's Law Dictionary, 1409 (Revised 4th ed. 1968).

No Kansas case defines the term "sudden quarrel." The few cases to even mention it do so in conjunction with "heat of passion" in quoting the general definition of manslaughter, and then go on to discuss only "heat of passion." *State v. Stafford,* 213 Kan. 152, 515 P.2d 769; *State v. Burrow & Dohlmar,* 221 Kan. 745, 561 P.2d 864; *State v. Pyle,* 216 Kan. 423, 532 P.2d 1309.

The same situation exists in the California and federal cases. The cases, if they mention sudden quarrel at all, just discuss heat of passion or else mix the terms together, such as "upon a sudden quarrel in heat of passion." *People v. Dugger,* 179 Cal. App. 2d 714, 4 Cal. Rptr. 388 (1960); see *People v. Sedeno,* 10 Cal. 3d 703, 518 P.2d 913, 112 Cal. Rptr. 1 (1974); *People v. Best,* 13 Cal. App. 2d 606, 57 P.2d 168 (1936).

Sudden quarrel is one form of provocation for "heat of passion" and is not separate and apart from "heat of passion." The provocation whether it be "sudden quarrel" or some other form of provocation must be sufficient to cause an ordinary man to lose control of his actions and his reason.

In this case there was no evidence of sufficient provocation for defendant's acts to entitle him to an instruction on voluntary manslaughter. His own testimony on direct examination on the issue was:

"I remember my wife was sitting in the chair in the front room and we started talking about something. This was pretty faint. I don't really remember well, but I do remember we started talking about something and disagreeing on something, but I don't remember what it was we was even disagreeing on. We wasn't a heated argument, not really what you call actually—maybe not even an argument really. It was just a disagreement on some little thing we was discussing."

We hold that the evidence at trial did not support an instruction on voluntary manslaughter as a lesser included offense. The trial court properly refused to give the requested instruction.

The defendant's next claim of error is allowing the prosecutor to question the defendant concerning a prior criminal conviction. The defendant had previously testified he had had a drinking problem for twenty years. Another defense witness had testified the defendant became more talkative and more excited when he drank. The defendant was asked about his behavior when he had been drinking. When asked if he became violent on such occasions, he answered:

"Not that I have ever remembered myself of actually becoming violent."

The state then asked about a prior conviction for "assault, beat, wound of a law enforcement officer." The defendant remembered the conviction and said he had been drinking at the time. The defendant had introduced evidence of and testified himself that he had been a heavy drinker for many years and been drinking heavily at the time of the incident involving his wife's death.

In *State v. Bright,* 218 Kan. 476, 543 P.2d 928, a defense witness responded to a question about the defendant:

"A. George is a nice fellow. He is an easy-going fellow. He loves to drink and be around people. Violent—George is not the violent type." (p. 477.)

Then on cross-examination the prosecution asked about a prior conviction of armed robbery. This court held that the testimony opened the door to allow questions on the prior conviction. (p. 478.)

"A witness who testifies to such identifying biographical data as place of birth, education, address, marital status, length of residence in the community and employment history does not through such testimony alone place his character in issue. However, when the testimony offered by the accused goes beyond those bounds and attempts to characterize the accused as having a non-violent disposition or character, the state may on cross-examination counter such testimony by showing that the defendant had been convicted of a violent crime in the past in order to rebut the testimony given on direct examination." (*State v. Bright,* supra, Syl. 1.)

The defendant had testified he had a drinking problem, had been drinking at the time of the incident that led to his wife's death, and that he was non-violent when drinking. He was then asked about a previous conviction for a violent crime and further stated he had been drinking at the time of that offense. While this testimony first came up on cross-examination, it was brought in before the state mentioned the prior conviction. This distinguishes the situation in reversed cases where there was no evidence of good character elicited from the defendant prior to the mention of prior convictions. *State v. Gunzelman,* 210 Kan. 481, 502 P.2d 705; see *State v. Taylor,* 198 Kan. 290, 424 P.2d 612.

We hold that the testimony relating to defendant's prior conviction was properly admitted under the totality of the circumstances herein.

The defendant's final claim of error relates to the admission of

defendant's statement to Detective Oakley. The trial court reviewed the evidence on the admissibility of the statements made to Detective Oakley, as well as those made to officers on the scene, in a *Jackson v. Denno* hearing. The statements made to Detective Oakley were allowed. The other statements were ordered suppressed. The suppressed statements were admitted at trial at the request of the defendant after he waived his right to their exclusion.

To be admissible, a confession or extrajudicial statement must have been freely and voluntarily made. (*State v. Kanive*, 221 Kan. 34, Syl. 1, 558 P.2d 1075.) In determining the voluntariness of a confession the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. (*State v. Kanive*, supra, Syl. 2.) The burden is on the prosecution to prove the voluntariness. (*State v. Kanive*, supra; K.S.A. 22-3215[4].) When a trial court conducts a full pre-trial hearing on the admissibility of an extrajudicial statement by the accused, determines the statement was freely, voluntarily, and knowingly given and admits the statement into evidence at trial, the appellate court should accept that determination if it is supported by substantial competent evidence. (*State v. Kanive*, supra, Syl. 5. See also *State v. Sovems*, 215 Kan. 775, 529 P.2d 181.) The facts and circumstances as shown by the record support the trial court's determination that the statements were voluntarily given. The point is without substantial merit.

We have carefully reviewed each point raised on appeal and have found no error. The judgment is affirmed.

PRAGER, J., dissenting: I respectfully dissent. I have no quarrel with the principles of law stated in the majority opinion. I disagree with the application of those principles to the facts and circumstances of this case. In my judgment the defendant here was denied a fair trial because the trial court failed to give an instruction on the lesser included offense of voluntary manslaughter (K.S.A. 21-3403). In *State v. Clark*, 214 Kan. 293, 521 P.2d 298, we held that it is the duty of a trial court to instruct the jury not only as to the crime specifically charged in the information but also with respect to such lesser offenses included therein as the evidence may justify. We further stated that the accused has the right to have his theory of the case presented to the jury under

appropriate instructions, where there is support in the evidence therefor, even though the evidence may be weak and not conclusive and the testimony of the defendant alone, if tending to show a lesser degree of crime, is sufficient to require the court so to instruct. In the instant case the trial court instructed the jury on the offense of murder in the second degree (K.S.A. 21-3402) and involuntary manslaughter (K.S.A. 21-3404). *Both* the state and the defense requested an instruction on voluntary manslaughter (K.S.A. 21-3403). The basic distinction between second-degree murder and voluntary manslaughter, other than the penalties, is the presence or absence of malice. (*State v. Wilson,* 215 Kan. 437, 524 P.2d 224.) The district court, by its refusal to give the requested instruction, found as a matter of law there was not sufficient evidence of a killing in the heat of passion so as to negative the existence of malice and to justify an instruction on voluntary manslaughter. In my judgment this was prejudicial error.

There was ample and substantial evidence from which the jury might find the following facts to be true:

(1) The killing was not accomplished with a deadly weapon. Mrs. Coop died as a result of a severe beating.

(2) Both the defendant and his deceased wife were alcoholics with severe alcohol problems existing over a long period of time.

(3) At the time the homicide occurred both the defendant and his wife were extremely intoxicated. The defendant had been drinking for several days. Several hours after the killing, when he was arrested, the undisputed evidence disclosed that the defendant had a strong odor of alcohol on his breath; his speech was slow; he was confused in regard to the lapse of time; he was unsteady on his feet. Defendant himself testified as to alcoholic amnesia on the night the homicide occurred. An autopsy was performed on Helen Coop which showed a .208 level of alcohol in her blood. Following the homicide, police officers found ten or eleven large empty whiskey bottles in the kitchen.

(4) The defendant and his wife apparently had had prior domestic fights arising from her drinking. There was testimony that when Mrs. Coop was drinking she became violent and became loud and used abusive language. The police had been called to the Coop home on several occasions because of disturbances.

(5) There was some kind of disagreement or argument between the defendant and his deceased wife which undoubtedly brought about the homicide. Because of his amnesia, the defendant had no real memory as to the nature of the disagreement or how the homicide occurred. The defendant testified that he did not remember striking his wife at all on the night in question, and that it was not until two or three days after the incident that he really understood what had happened.

(6) The undisputed evidence showed that a violent fight occurred which could best be characterized as a drunken domestic brawl. A laboratory investigator for the Wichita Police Department testified that there were signs of a struggle in the house. He picked up hair of either Mr. or Mrs. Coop in the wash sink in the kitchen, behind the rocker in the living room, and on the back porch. The defendant's hair was found under his wife's ring on her finger. Other evidence of a fight consisted of a broken mop handle and broom handle and, of course, the multiple bruises and abrasions about the victim's body. Apparently some time in the course of the evening the defendant tried to revive his wife, because water had been thrown on her body.

My concern in this case is that the trial judge took upon himself the function of the jury by deciding that the defendant could not be guilty of voluntary manslaughter. This was done even though a vigorous prosecutor suggested to the court that there was adequate evidence to justify an instruction on voluntary manslaughter. At the time the instructions were being considered the prosecutor stated to the court:

"Mr. Arbuckle: I have no objection to the proposed instructions. I would suggest to the Court that we should perhaps consider, and we would ask, an instruction on voluntary manslaughter. I feel there is some evidence in this case of a quarrel between the—the defendant in this case, in that Mr. Coop testified that one of the things he remembered was having a disagreement with his wife as he was standing in the doorway of the kitchen, and this was prior to the time she was injured. Would also point out I think the severity and the condition of Mrs. Coop's body indicates that certainly perhaps this type of beating would be inflicted in a heat of passion or in a quarrel situation. That's the only requested instruction I would have."

In spite of all of the evidence which I have outlined above, the trial court in denying defendant's motion for a new trial made the following observation in regard to the lack of evidence that the death resulted from a killing in the heat of passion:

"THE COURT: Well, it was my opinion at the time of the trial and it is still my opinion that to come within the framework of voluntary manslaughter, the jury or any trier of the facts, be it Judge or jury, would have to indulge in conjecture. There is no evidence that this death resulted from a quarrel or in the heat of passion. *Taking the defendant's defense into consideration, there was certainly no showing of any heat of passion or any quarrel that would give rise to a beating that would result in death. And I agree that could have happened.* Also, someone else could have done it. But, as I indicated at the trial, if the law is such that the juries are going to be allowed to just guess at lesser offenses so that they can at times get off the hook by guessing themselves into lesser offenses without any real evidence being presented to them, then the Supreme Court should reverse this conviction, but if we are going to take jurors as twelve reasonably intelligent people who are a part of this community and ask them to judge the facts in a case, then I don't think it is fair or right that we get too far into guesswork and conjecture.

"I see no error committed during the course of the trial, and the motion for new trial is overruled." (Emphasis supplied.)

It appears to me that the trial judge may have, for the moment, forgotten who had the burden of proof in the case.

The trial court and the majority of the court on this appeal have concluded that there was not sufficient evidence to show that the killing was done in the heat of passion. They have reached that conclusion because in their judgment there was no evidence of any provocation sufficient to arouse the passion of the defendant causing him to kill his wife. I simply cannot, in good conscience, accept such a conclusion. In my judgment there was ample evidence to show that a violent domestic brawl occurred between a drunken husband and wife and that a homicide was committed under circumstances indicating a killing in the heat of passion. The case should be reversed and remanded to the district court for a new trial so that the jury might consider a verdict of voluntary manslaughter.

OWSLEY and HOLMES, JJ., join in the foregoing dissenting opinion.