IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,495

STATE OF KANSAS,
*Appellee,*

v.

MIKA LEE THILLE,
*Appellant.*

SYLLABUS BY THE COURT

1.

An imperfect self-defense instruction requires some evidence of a subjective belief that lethal force was necessary.

2.

A voluntary manslaughter instruction under K.S.A. 21-5404(a)(1) for a killing done upon a "sudden quarrel or in the heat of passion" requires some objective evidence of sufficient provocation.

3.

Whether sufficient provocation exists requires an objective determination of whether a reasonable person would lose self-control under the facts presented such that the person acts from extreme emotion rather than reason, regardless of the subjective belief of the defendant.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 25, 2023. Appeal from Saline District Court; RENE S. YOUNG, judge. Oral argument held September 10, 2024. Opinion filed June 13, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

1

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Mika Lee Thille was convicted of reckless second-degree murder. Thille challenges his conviction on appeal and we affirm.

When Thille learned that his brother Max was at Justin Willingham's house, he left in the middle of the night with three companions—Valerie Vogel, Kayla Sitton, and Shannon Bryant—to go to the house. Max was using heroin at Willingham's house, and the group believed Max had taken Vogel's handbags from her hotel room a few hours earlier. In addition to being Thille's brother, Max had fathered children with Vogel. On arrival, Vogel led the group to the door and Willingham answered their knocking. Vogel yelled at Willingham, who was in the doorway, that she knew Max was inside and that he needed to return her bags. From there, witness testimony diverges.

According to Thille, he pushed past Vogel and demanded that Willingham get Max and return Vogel's belongings. Willingham reached for a gun at his hip, so Thille pushed Willingham and struck him in the face. A struggle ensued and Willingham's gun went off. Thille fell backwards and ultimately ran back out the front door. Vogel claimed that she remained outside while the rest of the group went into the house. She heard a scuffle and two gunshots before seeking refuge at a friend's house.

Sitton claimed she entered the home after Thille and Willingham engaged in a fistfight. She heard a gun go off, and then witnessed Thille draw a gun and fire multiple

shots at Willingham. Sitton fled and asked a neighbor to call 911 after she saw Thille drive away. For his part, Max claimed that Willingham drew a gun from his waistband and fired two shots into the ground. Max hit the ground for cover, and two more shots were fired, one of which killed Willingham.

Winnie Hogan, an occupant of the house, claimed that Willingham answered the door, two shots were immediately fired, and Willingham fell to the ground. Hogan claimed he stayed by Willingham's side until Willingham passed away and that there were two bullet holes in Willingham's chest. Other occupants of the house did not witness the shooting, only the aftermath. Justin Willingham died at approximately 3:41 a.m. from a gunshot wound to the chest. Thille turned himself over to law enforcement later that day and was taken into custody.

The State charged Thille with first-degree premeditated and felony murder, attempted first-degree murder, aggravated burglary, and attempted aggravated robbery. The district court also gave lesser included instructions for intentional and reckless second-degree murder. The jury convicted Thille of reckless second-degree murder and acquitted him of all other charges.

Thille raised challenges to the jury instructions before the Court of Appeals. He argued that the district court erred in denying his request for a lesser included offense instruction of voluntary manslaughter under both sudden quarrel and imperfect self-defense theories. Thille also argued, for the first time on appeal, that the jury should have received an involuntary manslaughter instruction as well.

The panel held that a voluntary manslaughter instruction was not factually appropriate under either theory. It further held that though an involuntary manslaughter instruction was factually appropriate, the district court's failure to give that instruction

was harmless. *State v. Thille*, No. 124,495, 2023 WL 5498984, at *10 (Kan. App. 2023) (unpublished opinion). We granted Thille's petition for review of these instructional issues, as well as the State's conditional cross-petition for review regarding the panel's conclusion that an involuntary manslaughter instruction was factually appropriate.

## DISCUSSION

Appellate courts follow a multi-step process when analyzing jury instruction challenges: (1) determine whether the issue is preserved for appeal; (2) examine whether the instruction was factually and legally appropriate; and, if the court finds error, (3) conduct a reversibility inquiry. *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019).

At the second step, we apply an unlimited standard of review of the entire record. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *State v. Holley*, 313 Kan. 249, 254-55, 485 P.3d 614 (2021), *on reh'g* 315 Kan. 512, 509 P.3d 542 (2022). At the final step, if the issue was preserved for appeal and we find the district court erred, we apply either a constitutional or statutory harmless error test. Thille does not argue that a constitutional right was violated and advocates for the statutory test. Under the statutory test, a court assesses whether there is no reasonable probability any error affected the trial's outcome in light of the entire record. 313 Kan. at 256-57.

*Voluntary Manslaughter*

Thille argues the district court committed reversible error by refusing to instruct the jury on voluntary manslaughter under either his sudden quarrel or imperfect self-

4

defense theories. The State concedes that Thille preserved this argument for review, so any error discovered by the court must have had no reasonable probability in affecting the trial's outcome for the conviction to survive review. 313 Kan. at 256-57.

Under K.S.A. 22-3414(3), "[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." Thus, a lesser included crime is generally legally appropriate. *Gentry*, 310 Kan. at 721.

Here, voluntary manslaughter is a lesser included offense of first-degree premeditated murder—which Thille was charged with—and thus the voluntary manslaughter instruction was legally appropriate. 310 Kan. at 721 ("Under this hierarchy, second-degree murder, voluntary manslaughter, and involuntary manslaughter are lesser included offenses of first-degree premeditated murder."). We must therefore determine whether the instruction was factually appropriate under either Thille's sudden quarrel or imperfect self-defense theories.

Under K.S.A. 21-5404(a)(2), voluntary manslaughter under an imperfect self-defense theory occurs when an individual knowingly kills a human being "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." The panel below held that the imperfect self-defense instruction was not factually appropriate because Thille was the initial aggressor and no exception allowing for initial aggressor self-defense was available to Thille. *Thille*, 2023 WL 5498984, at *6. Thille argues that, construing the facts in his favor, there is evidence to support he acted in self-defense due to Willingham either going for his gun or shooting first. The State, for its part, argues the court could affirm on alternative grounds. Namely, that Thille cannot show evidence of a good faith subjective belief that lethal force was necessary because he denied ever shooting Willingham.

5

We agree with the State. Thille points to no evidence indicating he had an honest (albeit unreasonable) belief that circumstances justified the use of deadly force. Thille denied ever using deadly force. Instead, he points to testimony from other individuals that Willingham fired at him first. While this evidence may be relevant to the objective circumstances facing Thille which may have informed his subjective beliefs about the situation, it is extremely difficult—perhaps impossible—to show a subjective belief that lethal force is justified when the defendant denies ever using lethal force. And here, construing all the evidence in Thille's favor about his subjective state of mind, Thille thought Willingham was reaching for a gun at his hip, and Thille responded with non-lethal force. Because Thille fails to point to any evidence of an honest belief of the need for lethal force, the district court correctly declined to give a voluntary manslaughter instruction based on imperfect self-defense.

Examining Thille's alternative theory, Thille argues instructing on a sudden quarrel theory was appropriate because the disparate testimonies show that there was yelling, struggling, wrestling, and shots fired before the shot that killed Willingham was fired. The State argues that Willingham was defending his home in response to a group descending on his front door in the middle of the night.

Voluntary manslaughter encompasses knowingly killing a human being "[u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-5404(a)(1). We have previously explained that a "sudden quarrel" is "one form of heat of passion." *State v. Brownlee*, 302 Kan. 491, 513, 354 P.3d 525 (2015). "'Heat of passion' is "any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror," based "on impulse without reflection."'" *Gentry*, 310 Kan. at 722. A quarrel that arises as an "'unforeseen angry altercation, dispute, taunt, or accusation could fall within th[e] definition [of heat of passion] as sufficient provocation. [Citations omitted.]'" *Brownlee*, 302 Kan. at 513

6

(alterations in original). Here, Thille advances a theory akin to an "unforeseen angry altercation" but we need not parse that claim too finely because all factual subsets of "heat of passion" killings require a showing of sufficient provocation under an objective standard—and that is where we focus our inquiry. *Gentry*, 310 Kan. at 722-23.

> """[T]o reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.""" 310 Kan. at 722.

A sampling of our precedent over the last several decades indicates that Thille did not objectively have sufficient provocation to justify the instruction. In *State v. McDermott*, 202 Kan. 399, 402-03, 449 P.2d 545 (1969), we held that evidence excluded any heat of passion theory where the victim had "'reared back'" and "'almost threw [the defendant] off [his] feet'" prior to starting to get into an automobile. The defendant then shot and killed the victim. The defendant testified that he was not angry at the time he shot the victim, but he was upset.

Likewise, in *State v. Stafford*, 213 Kan. 152, 515 P.2d 769 (1973), *reh'g denied and opinion modified* 213 Kan. 585, 518 P.2d 136 (1974), we found insufficient provocation where the victim had struck the first blow. There, the defendant's husband initiated conflict by insulting the defendant's son-in-law, commenting that maybe the defendant wanted to marry a friend of hers, and that she would not let her oldest son be beaten when really she was the one who deserved a beating. The husband then struck the defendant behind her left ear and knocked her glasses off. The blow did not bruise or harm her. Her husband's statements made her "real" angry. She sprayed him in the face with a paralyzing spray, and while he was dazed, she wrapped the cord from the tea kettle around his neck and started choking him. She eventually threw him on the floor and

7

while she was astraddle her husband, he asked her why she was doing these things to him, which really "pissed [her] off," so she hit him several times with a hammer. The husband died of strangulation. We held "although there was some evidence of prior quarreling and even of a blow being struck by the decedent, we believe insufficient provocation existed to reduce to voluntary manslaughter the eventual strangulation of one flat on his back in a disabled condition." 213 Kan. at 154-55, 166.

In *State v. Coop*, 223 Kan. 302, 302, 309, 573 P.2d 1017 (1978), we affirmed the defendant's conviction for second-degree murder. In so doing, we affirmed the district court's refusal to instruct on voluntary manslaughter. In that case, the defendant and his wife were both heavy drinkers. The defendant testified that they got into an argument, and that he hit his wife with a broom stick and a mop stick before stomping on her side while she lay face down on the floor. The defendant's wife passed away the next day, having never gotten up from the floor. After noting that a "sudden quarrel" is one form of sufficient provocation, we held that there was no evidence of sufficient provocation to warrant an instruction on voluntary manslaughter. 223 Kan. at 303-07. Similarly, in *State v. Guebara*, 236 Kan. 791, 797, 696 P.2d 381 (1985), we affirmed the district court's refusal to instruct on voluntary manslaughter due to insufficient provocation. The "provocation" in that case was the defendant's estranged wife stating that she had tried to drop misdemeanor criminal charges that she had filed against him, but the assistant county attorney would not let her. 236 Kan. at 792-93.

In contrast, we held in *State v. Hill*, 242 Kan. 68, 76, 744 P.2d 1228 (1987), that failure to instruct on voluntary manslaughter was error when there was evidence that the defendant had been assaulted and insulted by the victim immediately prior to the shooting. More specifically, there was a lot of pushing and shoving initiated by the victim against the defendant in a crowded hallway. The victim struck the defendant in the head and later pushed the defendant from behind. Testimony from witnesses indicated that

8

right before the defendant shot the victim, the victim was running at the defendant with her hand raised and something may have been in her hand. The defendant testified that she could not see defendant's hands and was scared for her life. 242 Kan. at 72-73.

Fast forwarding to *State v. Clark*, 263 Kan. 370, 374, 949 P.2d 1099 (1997), we again affirmed a trial court's denial of the voluntary manslaughter instruction. The defendant argued that his companion had hit a third party, the third party reached for his pocket, and the defendant shot the third party because he was reaching for a gun. But we held there was no evidence of a sudden quarrel. The district court in that case did, however, instruct on imperfect defense of another. 263 Kan. at 372-74.

Perhaps most similar to the current case is *Brownlee*, where we held that the evidence was insufficient to show "'adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason.'" 302 Kan. at 514. There, as here, there were multiple accounts as to what happened the night of the victim's death. The setting was a party hosted by John Doran and his girlfriend, Brandie Brownlee. Among the guests were Brandie's brother, Gustin Brownlee and her cousin Irvin. Police officers dispatched to the house at 2 a.m. found Irvin dead in the driveway from gunshot wounds.

Brandie gave the following version of events in a recorded statement:

"Irvin touched her disrespectfully, and they had an argument. Brownlee and Doran convinced her to calm down, and the men went outside. Brandie and Doran then went upstairs but could hear Brownlee and Irvin arguing in the basement. Irvin left the house but said he would be back to hurt Brownlee. Apparently Brownlee then also left the house. When Brandie tried to bring Brownlee back inside, he pulled out a gun and fired three shots into the ground. Brownlee and Irvin started arguing again, and Brownlee shot Irvin multiple times." 302 Kan. at 493-94.

At trial, Brandie added that at some point during the night, Irvin said he would "'snatch little niggas' guns and beat 'em with [them],'" and she thought that comment was directed at Brownlee or one other party guest because they were smaller than Irvin. However, other witnesses gave different accounts. One party attendee testified that a different party attendee had fired three shots into the ground and told everyone to calm down. She ran upstairs when she first heard shots, and when she looked outside again, "Brownlee and Irvin [were] 'rassling'" and "Doran was trying to break them up." She heard more shots before she ran to a car. 302 Kan. at 497-99.

Meanwhile, another attendee claimed she saw

"Irvin 'in [Brownlee]'s face' and said they were talking about a fight. In her police statement, [the attendee] had said Brownlee was spitting on Irvin. Irvin said, 'Bro, can you see or something,' and Brownlee responded, 'I'm not your bro or your cuz.' Everybody was arguing, and she heard Irvin say that his 'daddy taught him to take people's guns and beat them up or something.' [The attendee] said she was upstairs with the children when she heard 'a lot of yelling.' Everything appeared to cool down; then she heard gunshots." 302 Kan. at 499.

Doran testified Irvin had touched Brandie and another woman inappropriately, but that he had talked to Irvin and was not mad at him. He further testified that Brownlee was carrying a gun in the side of his pants, that Brownlee and Irvin had an argument, and that Irvin had said "something about cowards having guns." Doran tried to split the men up, but he was pushed or pulled away before Brownlee shot Irvin. 302 Kan. at 499.

We summarized the evidence as follows:

"Viewing the evidence in the light most favorable to the defense, Irvin had inappropriately touched Brandie, and they argued. At some point Irvin said he would 'smack' both Doran and Brandie. But this behavior and comment were not directed at

10

Brownlee. The only insulting or threatening language Irvin may have used toward Brownlee at some point during the night were his comments that he would 'snatch little niggas' guns and beat 'em with it' and that he would be back later to hurt Brownlee. Irvin was unarmed, but Brownlee was carrying a gun. Irvin and Brownlee argued outside the house, and one witness testified that they were 'rassling' before the shots were fired. But no evidence was presented about who started the physical fight or what the two men were arguing or fighting about. The dispute was not sudden; it merely simmered." 302 Kan. at 514.

These cases demonstrate the difference between a "sudden quarrel" and a defendant who acts with an imperfect self-defense state of mind. The metric of sufficient provocation is not the subjective belief of the defendant as to the danger facing him or her. Whether sufficient provocation exists requires an objective determination of whether a reasonable person would lose self-control under the facts presented such that the person acts from extreme emotion rather than reason. The court must objectively examine whether Thille's case fits the reasonable person rule. We are convinced that it does not.

Construing the facts in Thille's favor, he learned that his brother had taken Vogel's bags and was now at a drug house. Thille went with three others to Willingham's house in the middle of the night, and Vogel started yelling at Willingham to get Max and her bags. Thille pushed past Vogel, got into a scuffle with Willingham, and Willingham either reached for a potential gun or fired a gun at him. Thille points to no evidence that Willingham said anything to provoke Thille. Rather, Thille approached Willingham and the two got into a physical altercation. This situation is thus unlike *Hill*, where the victim repeatedly antagonized the defendant before attacking her in a dark hallway. It seems that here, like *Brownlee*, there was a simmering conflict brewing that was initially triggered by Max absconding with Vogel's bags. But this background conflict does not provide a basis for sufficient provocation. See *State v. Wade*, 295 Kan. 916, 926, 287 P.3d 237

11

(2012) ("A slow burn is not heat of passion."). And "ongoing and protracted interactions do not usually provide factual support for a voluntary manslaughter instruction." *State v. Lowry*, 317 Kan. 89, 95, 524 P.3d 416 (2023).

The district court was correct to deny a voluntary manslaughter instruction based on sudden quarrel.

*Involuntary Manslaughter*

Finally, Thille argues the district court erred by failing to instruct the jury on involuntary manslaughter. Thille did not request this instruction before the district court. The State argues that the instruction is not factually appropriate, and even if it was, failing to give the instruction was not clear error.

This issue is likewise governed by our multi-step standard of review as set forth above. *Gentry*, 310 Kan. at 720. But at the final step, since Thille did not request an involuntary manslaughter instruction based on the killing of a human being committed recklessly, we instead review for clear error. K.S.A. 22-3414(3). To show clear error, a defendant must prove that the instruction was legally and factually appropriate, and the court must be firmly convinced the jury would have reached a different verdict if the district court had given the instruction. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

Involuntary manslaughter is the killing of a human being committed, as relevant here, recklessly. K.S.A. 21-5405. The jury convicted Thille of reckless second-degree murder, which is the killing of a human being "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-5403(a)(2). A person acts "recklessly" when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and

12

such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j). Thus, the distinction between involuntary manslaughter and reckless murder in this case is the level of disregard for human life.

Involuntary manslaughter is a lesser degree of first-degree murder and would have been a legally appropriate instruction. *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019). The State argues, however, that the instruction was not factually appropriate because "[f]iring a gun twice in a house near a person, which then results in that person's death, cannot be considered anything other than extreme indifference to the value of human life." But this argument downplays our standard, which requires reviewing the evidence in the light most favorable to Thille. There is conflicting evidence as to who fired weapons, when weapons were fired, and at whom weapons were fired. For instance, Thille testified that Willingham's gun went off while they were struggling. If one accepts that Thille did not intend to kill his victim, as the jury did in this case, the facts also support a conclusion that Thille may have acted with mere recklessness. Failure to instruct on involuntary manslaughter was error. See 309 Kan. at 1301 ("It was the jury's task, not the district judge's, to consider the evidence and assess factors—such as the number of people in the basement and James' reasons for shooting—before reaching a conclusion on whether James' recklessness rose to the second-degree murder level of extreme indifference to the value of human life.").

Nevertheless, the failure to instruct on involuntary manslaughter was not clear error because Thille fails to firmly convince us that the jury would have reached a different verdict had the instruction been given. *Crosby*, 312 Kan. at 639. The facts demonstrate that Thille barged into someone's home in the middle of the night, got into a physical fight with the victim, and then shot the victim during the course of the fight. This evidence strongly supports the jury's conclusion that Thille acted with an extreme

indifference to human life. *James*, 309 Kan. at 1304 ("Despite the theoretical possibility that the jury could have reached an involuntary manslaughter verdict . . . such a verdict was highly improbable.").

While Thille does briefly mention the possibility of involuntary manslaughter via imperfect self-defense, K.S.A. 21-5405(a)(4), he does not develop this argument and we decline to consider it. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (noting issues inadequately briefed are considered abandoned).

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

BILES, J., concurring: I agree Thille's conviction should be affirmed but disagree with the majority's analysis of the case's facts to reach that result. The majority incorrectly frames the issue as one of adequate provocation when discussing voluntary manslaughter, rather than focusing on the foreseeability element central to a sudden quarrel theory. This makes a difference. The question before us is whether Thille was entitled to an instruction on the sudden quarrel form of voluntary manslaughter as a lesser included offense based on his defense theory. See K.S.A. 21-5404(a)(1) ("Voluntary manslaughter is knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion.").

But instead of directly answering whether the trial evidence supported a sudden quarrel, the majority goes off on a tangent for reasons I do not understand by adopting a broader "heat of passion" approach. The majority is apparently under the impression that there cannot be a sudden quarrel if there is no heat of passion because heat of passion

14

may be caused during a sudden quarrel. Really? This logical fallacy does not follow from its premise, but just as importantly, it effectively renders the statutory term "sudden quarrel" in K.S.A. 21-5404(a)(1) meaningless. And we don't usually do that. See *State v. Sedillos*, 279 Kan. 777, Syl. ¶ 3, 112 P.3d 854 (2005) ("[I]t is presumed that the legislature does not intend to enact useless or meaningless legislation. The court should avoid interpreting a statute in such a way that part of it becomes surplusage.").

Regardless, by analyzing the issue as it does, the majority evades our applicable standard, which requires an instruction on a lesser included offense whenever, viewed in the light most favorable to the defendant, "some evidence" would reasonably justify it. See K.S.A. 22-3414(3); *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022). And this is particularly puzzling here because the majority's statement of the facts acknowledges there is at least *some evidence* Thille was provoked. It details Thille's testimony that he "pushed past Vogel and demanded that Willingham get Max and return Vogel's belongings. Willingham reached for a gun at his hip, so Thille pushed Willingham and struck him in the face. A struggle ensued and Willingham's gun went off." Slip op. at 2. And, as the majority continues, Max claimed, "Willingham drew a gun from his waistband and fired two shots into the ground. Max hit the ground for cover, and two more shots were fired, one of which killed Willingham." Slip op. at 3.

So why isn't testimony indicating an opponent drew a gun considered "some evidence" of provocation when viewed in the light most favorable to Thille? I cannot figure that part out when reading the majority decision.

With that disillusionment out of the way, let's consider how an analysis that addresses what Thille argued gets us to the same place. It's straightforward, and in my view, pretty obvious.

15

A sudden quarrel requires an "'altercation or angry dispute'" "happening or coming unexpectedly." *State v. Ruiz-Ascencio*, 307 Kan. 138, 142, 406 P.3d 900 (2017); Merriam-Webster Online Dictionary. And in this case, Thille fails to point to any evidence Willingham's reaction at the door was unforeseeable. Cf. *State v. Wilson*, 308 Kan. 516, 526, 421 P.3d 742 (2018) ("Put simply, it is foreseeable that violence begets violence."). I would hold the district court correctly denied a voluntary manslaughter instruction based on sudden quarrel because Thille's trial offered no evidence on foreseeability.

My bottom line is that the majority's dismissal of Thille's instructional error claim using a heat-of-passion analysis inexplicitly ignores the sudden quarrel issue Thille raised. Its motivation for insisting on its approach escapes me. I join with the majority on the remaining issues.

WILSON, J., joins the foregoing concurring opinion.