No. 21,264.

THE STATE OF KANSAS, *Appellee,* v. KATE SCHWENK, *Appellant.*

SYLLABUS BY THE COURT.

MANSLAUGHTER—*Trial—No Reversible Error in Record.* Assignments of error relating to testimony received and rejected, instructions given and refused, and the conduct of the jury considered and held to be without sufficient merit to warrant a reversal of the judgment.

Appeal from Leavenworth district court; JAMES H. WENDORFF, judge. Opinion filed July 7, 1917. Affirmed.

*John T. O'Keefe,* of Leavenworth, for the appellant.

*S. M. Brewster,* attorney-general, *Floyd Harper,* county attorney, and *David W. Flynn,* of Leavenworth, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was charged with manslaughter in the third degree for killing her husband. The verdict was guilty of manslaughter in the fourth degree. Judgment was rendered on the verdict, and the defendant appeals.

The defendant's husband was a joint keeper, and she complained of his failure to support her properly. On the night of the killing the defendant locked up his joint and he and his wife went to the home of an acquaintance, where with others they spent the time until far into the night drinking beer. Several times the defendant and her husband quarreled. At some time between 1:30 o'clock and 2 o'clock in the morning

they started home. When out on the sidewalk the defendant's husband struck her, took her by the throat, pushed her backward, and struggled with her. She carried a pistol in her apron pocket, and while thus assailed fired a shot. Her husband did not desist, and she fired again. The bullet penetrated his heart.

The defendant signed a written statement purporting to give the events of the night, before and at the time of the killing. The statement was quite at variance in many important particulars with the facts developed at the trial. In the statement the defendant admitted she had been drinking intoxicating liquor, and said:

"When we got outside the gate, Pete struck me behind the ear. It did not hurt me but made me mad. I turned around and shot twice to scare him. I did not shoot to kill him, and did not know I had hit him until he fell."

At the trial the defendant testified as follows:

"Q. At that time after he hit you this blow and turned you around, what did he do? A. He grabbed me and tried to choke me, strangled me. I tried to get off of him. I was afraid of him in his condition.

"Q. What did you do about this pistol? A. And when we were fighting there, I was trying to protect myself, trying to get off of him. I thought he was going to kill me, choking me. I fired a shot in the air to frighten him off of me.

"Q. Did he stop when that shot was fired in the air? A. He did n't. It only angered him the worse and in our scuffle, that gun was discharged. I do not know whether I shot him, or whether he shot himself.

"Q. Was his hand on your neck? A. It was choking me.

"Q. At the time of that last shot being fired? A. It was.

"Q. What did you think as the last shot was fired? A. I thought he was trying to kill me, because I knew his temper when he was drinking that way, and with his choking me and all I did n't know but what he might choke me to death. And there was nobody around to help and I thought if I would shoot it would attract the attention of somebody who would come to me. I wanted to get him off of me.

"Q. Were you struggling at the time? A. We were.

"Q. Were you trying to defend yourself at the time? A. I was.

"Q. It looked to you at that time as if he was going to kill you, or hurt you very much. A. That is what I thought—I surely did—it looked that way."

It would unduly extend this opinion to discuss at length the great number of subjects covered by the defendant's brief; consequently the court will do little more than announce its conclusions respecting those which are of most importance.

The admission in evidence of the defendant's written state-
ment is assigned as error. It is said there was testimony that
she was in a hysterical condition when the statement was
signed, that she was not cautioned or warned, and had no ad-
vice, that the statement contained only a part of what she told
the officers, and that she did not remember making the state-
ment, or the contents of the writing. There was evidence,
however, that the statement was freely and voluntarily made,
when the defendant was calm and rational, that it contained
the substance of what she said, and that when it was pre-
pared and read to her she required it to be changed before she
signed it. Consequently the statement was admissible, the
weight to be given to it being a matter for the jury.

The clothes which the deceased wore when he was shot were
produced in evidence, and failed to show powder mark or
burn, such as would have followed shooting at close range.
The coroner who took the clothes from the body of the de-
ceased produced them, identified them, pointed out the bullet
hole, and was not cross-examined. It is said no sufficient ac-
count of the clothes between the time they were taken from
the body of the deceased and the time of the trial was given.
It was not necessary for the state to negative change of con-
dition and appearance before offering the clothes in evidence.
It is said the clothes were offered to rebut matter brought out
by the state. The assertion is not supported by the record.
It is said that the use of clothes as evidence under like circum-
stances was disapproved in the case of *The State v. McAnar-
ney*, 70 Kan. 679, 79 Pac. 137. In the McAnarney case no com-
plaint was made because the garment worn by the deceased
was introduced in evidence. The error committed was in re-
ceiving testimony respecting another garment which, so far as
the evidence disclosed, had no connection with the deceased or
with the homicide. It is said that use of the clothes as evi-
dence was prejudicially harmful to the defendant. The court
has no reason to doubt the truth of the statement. Evidence
tending to establish guilt or to break down a defense is likely
to be of that character.

Error is assigned on the refusal of the court to permit a
witness to testify that he had informed the defendant of the
quarrelsome and brutal disposition of her husband when he
was drinking. If the defendant had been content to prove in-

formation of the character indicated, it would have been admitted. The deceased had formerly been married to the witness' sister. What the defendant's attorney did was to ask a series of questions about the brutality of the deceased toward the witness' sister, concluding with asking if the witness had informed the defendant of "that treatment." The court advised the attorney that his method was improper, but he persisted, and the witness was not asked if previous to the killing he had a conversation with the defendant relating to the subject of her husband's disposition when under the influence of liquor, and if so, what the witness told her. The pertinent matter was not occurrences within the knowledge of the witness which informed the witness of the deceased's character for violence and brutality, but what information he had conveyed to the defendant on the subject. The law is fully discussed in the case of *The State v. Burton,* 63 Kan. 602, 66 Pac. 633, which the defendant cites and relies on. What the defendant fails to note is that in the Burton case the defendant himself was the witness undergoing examination. The defendant's testimony quoted above shows that she knew her husband's temper when he was drinking. If her attorney had deemed the subject to be of importance she could have been further interrogated along the lines indicated in the Burton case.

Various instructions to the jury are criticised, and it is said the court erred in submitting to the jury the inferior degree of manslaughter of which the defendant was convicted. The charge of manslaughter in the third degree contained in the information was based on the defendant's written statement— killing her husband in the heat of passion, without design to effect death, with a deadly weapon. Manslaughter in the fourth degree includes involuntary killing in the heat of passion, with a dangerous weapon, and killing by act, procurement, or culpable negligence, which would be manslaughter at common law. The testimony of the defendant quoted above plainly required the court to instruct the jury on both branches of the inferior degree.

The instructions relating to the justification of self-defense are criticised. An assault may be made under such circumstances that there would be reasonable cause to apprehend a

design to inflict great personal injury and would be immediate danger of the design being accomplished, but the taking of life would be wholly unnecessary to frustrate the design. In making this subject plain to the jury the court used expressions which the defendant says trenched upon her right to stand her ground when assailed. The right of the defendant to repel force without retreating was covered by a very full and clear instruction devoted to that single subject. The law relating to self-defense could not be embraced in a single instruction. All the instructions devoted to that subject must be read together, and when this is done the defendant's rights appear to have been fully conserved.

The jury were instructed that in order to justify the defendant in killing her husband, there must have been reasonable ground to believe she was in imminent danger of death or great bodily harm, and that the jury were to judge whether or not the circumstances were such as to induce such a belief. The defendant says the instructions to this effect trenched upon her right to act upon the circumstances as they appeared to her. This subject has been treated at length in so many decisions of this court that it is not necessary to do so again. It is perfectly true that a person assaulted is justified in acting on facts as they appear to him, and is not to be judged by the facts as they actually existed according to subsequent proof. If an assailant appear to be in the act of shooting, he may be killed in self-defense, although the gun was not loaded. But the statute requires reasonable cause to apprehend a design to commit a felony or to do some great personal injury (Gen. Stat. 1915, § 3370), and that reasonable cause must appear to the jury.

Complaint is made of three instructions covering the subjects of intoxication as a defense, the unlawful character of the deceased man's business, and the jury's unconcern with the matter of punishment. The instructions correctly stated the law. Whether requested by the defendant or not, and whether necessary or important or not, they did the defendant no harm.

It is said the court ought to have instructed the jury with reference to excusable homicide. The homicide was not excusable under the statute because a dangerous weapon was

used, and was not the result of innocent misadventure in the sense of the common law.

The defendant complains because twenty-seven requested instructions were not given. The jury were adequately instructed.

At the hearing of the motion for a new trial the deliberations of the jury were arraigned and tried. The court found that no misconduct had occurred, and the finding is approved.

The judgment of the district court is affirmed.