No. 36,386

The State of Kansas, *Appellee*, v. Annie Smith, *Appellant*.

(167 P. 2d 594)

Opinion filed April 6, 1946.

*Thomas H. Finigan,* of Kansas City, argued the cause for the appellant.

*Ulysses G. Plummer,* assistant county attorney, argued the cause, and *A. B. Mitchell,* attorney general, *L. W. Lundblade,* assistant attorney general, and *S. M. Terbovich,* county attorney, were on the briefs for the appellee.

The opinion of the court was delivered by

Parker, J.: The defendant, Annie Smith, was convicted of murder in the second degree for the killing of Annie Pierce.

On the evening of the 14th of September, 1944, the defendant, who was looking for her husband, went to the Cozy Inn, located at 5th and Oakland streets in Kansas City, Kansas. She found him sitting at a table in company with the deceased and her sister, Lorene Walters. She went in, talked with him without making any disturbance or without saying a word to either of the two women, requested that he come home and finally, as she states, at his suggestion went outside to wait for him to come out. Shortly thereafter, and before defendant's husband had left, Annie Pierce and Lorene Walters got up from the table and proceeded to leave the place. As they went through the door they found defendant standing outside. There ensued the events which resulted in the death of Annie Pierce.

Up to this point there is no dispute as to the facts. Since there were only two witnesses, Lorene Walters, a witness for the state,

and the defendant, who professed to know anything about the details of the tragedy resulting in the homicide, we shall depict those facts from portions of the record. In doing so we quote only from evidence adduced by the state on direct examination of Lorene Walters, and from testimony which it elicited from the defendant on cross-examination.

In addition to other matters Lorene Walters testified as follows:

"Q. And you and your sister got up and left? A. Yes, sir. We got up. When we got out the door she was standing there. Annie Smith. Well, she and some other people, I don't remember who they were, and she called my sister, Annie May, and she said, 'Annie May Pierce' and my sister turned around, and she said, 'Don't you know Adrian Smith is my husband?' And about that time she struck my sister and hit her on the breast and as she went to strike back at my sister, I threw my arm between them to protect her and got stabbed on the arm.

"Q. What did she strike your sister with? A. Well, I suppose some sharp instrument, because I got cut on the arm as I threw my arm between them. Annie Smith ran across the street to the Northwest corner of Oakland, by the Wyandotte Cab Company.

"Q. All right. What did your sister do? A. Well, my sister ran behind her and they crossed the street and my sister fell when she entered the drive over there and Annie Smith turns around and comes back across 5th Street and Oakland Street and went East. . . ."

Some of the questions asked the defendant by the state on cross-examination and answers she made thereto read:

"Q. How long did you wait outside out there before these two sisters came out? A. They came immediately after I walked out. They came right behind me.

"Q. How far were you standing away from the entrance of the Cozy Inn? A. Almost to the curb.

"Q. Now, when these girls came out the door, did they come directly to you? A. They came right to me.

"Q. Right to you. Now at that time, did they have anything in their hands? A. Their pocket books.

"Q. Under their arms? A. I think Annie May Pierce had hers under her arm. Seems like Lorene had hers in her hand.

"Q. All right. They walked right up to you? A. Yes, sir, they did.

"Q. Both of them? A. Both of them.

"Q. And which one spoke to you first? A. Lorene Walters.

"Q. And what did she say? A. She said, 'What business did she have calling Adrian from us?'

"Q. . . . . I see, after she said that, then what happened? A. This An-

nie May Pierce said, 'She's not got any damn business calling him from me.'

"Q. Where was she when she said that? Still at her sister's side? A. They were together.

. . . . . . . . . . . . . . .

"Q. All right, then what was the next thing she said? A. She said, 'I ought to cut your damn throat.'

"Q. Who said that? A. Annie May Pierce.

"Q. She was still standing at her sister's side? A. They were standing there talking to me, yes.

"Q. What was her sister doing at that time? A. She wasn't doing anything right then.

"Q. Proceed. What was the next thing said or done. A. When she said she ought to cut my damn throat, I said, 'Annie May, I wasn't talking to you. I was talking to my husband.'

"Q. Right at that time, did anybody make any attempt to strike you? A. She said— . . . not right then.

"Q. Had you made any attempt to strike anyone? A. Not right then I didn't.

"Q. All right. What was the next thing said or done? A. And she said— Lorene said, 'Well I will cut her damn throat,' and she struck at me, and I throwed up my arm like that (indicating) and my coat fell off my back, and then when they struck me again, I ran.

"Q. Just a minute, please, you stated that she struck at you when she made this remark, was it, to cut your damn throat? A. Yes, sir.

"Q. And who made that remark? A. Annie May Pierce said she ought to cut my damn throat.

"Q. And at that time she struck at you? A. Yes, sir.

"Q. What with? A. With her razor.

. . . . . . . . . . . . . . .

"Q. All right. After she struck at you, what happened? A. Then Lorene Walters said, 'I will cut her damn throat myself.'

"Q. All right. Now stop right there. Where were you after Annie Pierce struck at you with the razor and you listened to this conversation with her sister? A. I was backing up trying to get away from them.

"Q. Running or walking? A. I backed up walking. I was walking.

"Q. . . . Did her sister come toward you? A. Yes, sir, they both did.

"Q. . . . Did this other one still have the razor in her hand? A. Yes, sir.

"Q. And the other one had a knife in her hands? A. Yes, sir, and she struck at me with it, and I ran.

"Q. At the time you backed up, one sister had a razor and the other had a knife.

"Q. And were backing you up? A. Yes, sir.

"Q. Yes, and they were talking to you? A. Yes, sir.

"Q. And walking toward you? A. Yes, sir.

"Q. And, after backing up, you didn't run, you say, until the sister struck at you, and then that's when you ran? A. Yes, sir.

. . . . . . . . . . . . . . .

"Q. How far did you get back before the sisters struck at you the last time? A. Back to the curb.

"Q. . . . And both of them at that time, you stated, had their instruments out. One had a knife, and one had a razor? A. Yes, sir.

"Q. But you didn't run? A. I run after Lorene Walters struck at me. Sure I run. . . .

. . . . . . . . . . . . . . . . .

"Q. Now state to the jury when you heard this conversation you have stated on direct examination with relation to the fact this sister said, 'I have stabbed her,' or 'I have stabbed my own sister.' A. She didn't say that. Annie May Pierce said, 'You have cut me instead of her.'

"Q. Oh, Annie May said that? A. Yes, sir, I heard her holler, and she said, 'Oh, you have cut me instead of her.'

"Q. Now, didn't you tell me, I think you did, that Annie Pierce struck at you with a razor, and that her sister Lorene Walters whipped out her knife, and that both of them had a knife, and a razor out at the same time? Didn't you say that? A. Yes, sir . . .

. . . . . . . . . . . . . . . . .

"Q. But you were standing still. You were holding your own, holding your ground. You hadn't backed up then when they first cut at you with the razor —you hadn't done any backing then. A. When they first cut at me, I backed up a little.

"Q. Then you were backing up at the time these girls began talking to you? A. After they started crowding up on me, I backed up.

"Q. And both sisters were right at each other's side crowding you? A. Yes, sir, they were crowding, walking up on me.

"Q. And one reached in her pocket and pulled out a razor, and the other reached in her pocket and pulled out a knife? A. Yes, sir.

"Q. I want to know how far they were away from you when you first saw that each of them had their knives out, two feet, three feet, or were they crowding you at that time? A. They was crowding me at that time.

. . . . . . . . . . . . . . . . .

"Q. What kept you from backing up any further? A. If I had, I would have to have went out in the street.

. . . . . . . . . . . . . . . . .

"Q. And is that the time the sister, you say, struck at you. A. Yes, sir, and then I turned and ran.

"Q. I see. Now you say you ran across the street, and you heard a remark by the sister saying something about having struck her own sister? A. Yes, sir, I ran and she said, 'Oh, you cut me instead of her.'

. . . . . . . . . . . . . . . . .

"Q. Where was her sister at the time you saw her fall. A. They both were running after me. . . ."

As heretofore indicated only two witnesses testified as to how the actual killing occurred. However, the state in its case in chief produced one witness who stated in substance that immediately after the argument in front of the Cozy Inn she observed the defendant

running up the street with the two sisters in pursuit, and on rebuttal another who testified that on the evening of the tragedy—at a time which must have been after its occurrence—she overheard the defendant tell a neighbor, one Marie Sheppard, that she had cut a girl.

We have detailed defendant's version of the affair through the medium of statements made by her on cross-examination at the instance of the state for the purpose of emphasizing that throughout the trial all persons connected therewith—the state, the defendant, the trial court and even the jury when the cause was submitted—were bound to know the proof disclosed facts which clearly and distinctly raised the issue of justifiable homicide or self-defense. The fact we have adopted that method of detailing the respective versions of the parties as to how Annie Pierce was killed is in no sense to be construed as an indication the cross-examination of defendant related to matters not testified to by her in defending the charge of murder. On that account it should be here stated she stoutly contended throughout the trial that she had no knife and did not kill the deceased, also that on direct examination she claimed to have heard the deceased say to her sister "Oh, you cut me instead of her."

What has been heretofore recited is, of course, a mere outline of the facts and circumstances disclosed by the evidence. However, it suffices as a verbal portrait of what was submitted to the jury and at the same time limits an extended record to facts pertaining to what we deem the question decisive of this appeal.

Appellant's specification of errors contains at least one ground for reversal of the judgment which we believe is entitled to serious consideration. It reads as follows:

"The court erred in not giving an instruction upon self defense as requested by the defendant."

In fairness to the trial court it should be said that if the case is to be reversed upon the foregoing assignment of error that decision will not be reached upon the basis the trial court was requested by defendant to instruct the jury on the law of self-defense. On the contrary the record reveals the court interrogated the assistant county attorney, who was representing the state, and the then counsel for defendant, on the necessity for an instruction on that subject. The representative of the state took the position that none was required while the then attorney for defendant stated:

"Well, I leave that in the wide discretion of the Court. In this case, we did not introduce any evidence of self defense, but if, in the event the evi-

dence which has been introduced, is conflicting to such a degree and to such an extent that the Court thinks in his sound judgment the instruction on self defense should be given, it is entirely within the discretion of the Court."

Even so, and irrespective of the foregoing statement, it must be noted the trial court was not deceived or lulled into committing error as a result. It had prepared an instruction on self-defense, it had stated there was a question in its mind as to whether under all the circumstances such an instruction was not required, it sought views of counsel but stated it would determine for itself the propriety of such action, and after hearing argument of counsel it announced it had decided not to instruct on self-defense for the reason that after a careful examination of the evidence it was not only convinced such defense was not an issue in the case but that there was no evidence which would warrant submitting it to the jury.

The same spirit of fairness which prompts our comment with respect to the inaccuracy to be found in appellant's specification of error, to which we have just referred, requires the statement that counsel who represents her on this appeal is in no sense responsible for what transpired at the trial. During its progress she was represented by another attorney who is not now employed by her. Present counsel came into the case long after this appeal had been perfected.

The principal question then is whether the trial court was required to give an instruction on self defense under the facts disclosed by the evidence and erred in failing to do so.

One section of our statute, G. S. 1935, 21-404, provides:

"Homicide shall be deemed justifiable when committed by any person in either of the following cases: First, in resisting any attempt to murder such person, or to commit any felony upon him or her. . . ; or second, when committed in the lawful defense of such person, . . ."

Another dealing with procedure in criminal cases requires:

"The judge must charge the jury in writing and the charge shall be filed among the papers of the cause. In charging the jury he must state to them all matters of law which are necessary for their information in giving their verdict. If he presents the facts of the case, he must inform the jury that they are the exclusive judges of all questions of fact." (G. S. 1935, 62-1447.)

In construing the force and effect of the section of the statute last quoted it is now familiar law in this state that it requires the trial court to charge the jury on all matters which are necessary for its information in arriving at a verdict and that in this connec-

tion in prosecutions for homicide it is that court's duty to instruct not only as to the offense charged but as to the lesser offenses of which the accused might be found guilty under the information and upon the evidence adduced even though no request for an instruction on such lesser offense was made. (*State v. Severns,* 158 Kan. 453, 458, 148 P. 2d 488; *State v. Phelps,* 151 Kan. 199, 97 P. 2d 1105; *State v. Gloyd,* 148 Kan. 706, 84 P. 2d 966.)

It has even been held that under such circumstances the failure of counsel, on request of the court, to formulate a theory on which an instruction could be based does not excuse failure to give it. See *State v. Clark,* 69 Kan. 576, 77 Pac. 287, where it was held:

"The court will not be justified in refusing to instruct the jury, when the testimony requires it, on the lower degrees of crime included in a charge of murder, for the reason that counsel for the accused, upon request from the court, failed or neglected to formulate a theory on which such instructions might be given. Section 5681 of the General Statutes of 1901 requires the court, in a criminal case, to state to the jury all matters of law which are necessary for their information in giving a verdict." (Syl. ¶ 3.)

Less has been said on the question of whether an instruction on self defense is required under such section when that issue is raised by the evidence in a given case. However, it too has been determined. In the case of *State v. Jackett,* 81 Kan. 168, 169, 179, 105 Pac. 689, where, as here, the defense was the defendant had not committed the homicide with which he was charged, we held:

"In a prosecution for a homicide, where there is substantial evidence tending to show that the accused acted in self-defense, the fact that he denies having committed the act which caused the death is not necessarily a ground for refusing to submit to the jury the question whether the killing was justifiable." (Syl.)

And said:

". . . Where there is evidence that would support a finding of self-defense it has been held that the instructions should cover that feature of the case, notwithstanding the defendant's testimony that he did not do the act from which the death resulted. (*Reed v. The State,* 141 Ind. 116; *Morris v. Commonweath* [Ky. 1898] 46 S. W. 491; *Gatliff v. Commonwealth* [Ky. 1908] 107 S. W. 739.) . . .

"In the present case it is plain that the evidence required the question whether Jackett acted in self-defense to be left to the jury, unless his denial of the shooting eliminated that issue. If the evidence tending to justify the killing had been clear and convincing there would be little difficulty in saying that the jury should pass upon that feature of the case, notwithstanding his protest that he fired no shot. Suppose, by way of illustration, a bystander had seen the fatal shot fired, while the pistol was pointed upward at an angle

of forty-five degrees, and that marks on a building had been found indicating that the bullet had been deflected downward: under such circumstances the theory that the defendant fired merely to frighten away his assailants, the death of one of them resulting from an accident, would have presented itself so insistently that the defendant's denial of the shooting obviously should not prevent the jury from acting on the real facts. Whether an affirmative defense which is inconsistent with a part of the defendant's own testimony should be submitted to the jury can not depend upon the amount of proof back of it, so that it is supported by some substantial evidence." (pp. 171, 173.)

In those cases where self defense is invoked by the proof we conclude it is the duty of the court to charge the jury on that issue irrespective of whether there has been a request for an instruction, regardless of whether counsel has been called upon and failed to formulate a theory on which it could be given, and notwithstanding such counsel has stated he believes its submission rests in the court's discretion.

Our conclusion is not unsupported by the authorities. In 41 C. J. S. 163, 164, 165, § 375, it is said:

"As a general rule, where self-defense is involved and there is any evidence, although slight, to establish it, it is proper for, as well as the duty of, the court to instruct the jury fully and clearly on all phases of the law of self-defense that are warranted by the evidence, even though such defense is supported only by accused's own testimony, or accused denies the killing or participation in the homicide; and it has also been held that such an instruction is proper even though no issue of self-defense is raised. Where such an instruction is necessary and proper under the issues and evidence in the case, a failure or refusal to give it constitutes error, . . ."

See, also, 26 Am. Jur. 540, § 549; *State v. Truskett*, 85 Kan. 804, 118 Pac. 1047.

For a general discussion on all phases of the subject see 4 Warren on Homicide (Perm. ed.), § 338 and numerous decisions there cited.

With the rule established we review the evidence for the purpose of ascertaining if testimony appears there which must be regarded as raising an issue of self-defense. As we do so it is well to remember the test is not how much but is there any. Likewise, it must be kept in mind that denial of the actual killing does not deprive an accused of other defenses known to the law.

No good purpose would be served by repeating verbatim the portions of the record heretofore quoted. Briefly, when carefully examined it reveals, if believed, that the appellant was attacked by

the deceased and her sister under conditions which would have justified her in defending her own life even to the extent of taking the life of another and that the state in a prolonged cross-examination saw fit to repeatedly bring such facts to the attention of the jury. It shows that the state's own attorney asked the appellant if she had made any attempt to strike any one and that on at least one occasion she answered "no not then I didn't." In addition it discloses the prosecution in its case in chief established that during the controversy the appellant was observed running away with the deceased and her sister in hot pursuit. And last but not least, the state on rebuttal produced a witness who stated she had overheard the appellant tell another that she had just cut a girl.

When consideration is given to all the matters to which we have just referred we have no difficulty in concluding the evidence brought forth by the state itself, to say nothing of the defendant's own testimony, clearly raised an issue of self defense to be submitted as a question of fact for the determination of the jury. It follows that under our statute (G. S. 1935, 62-1447) the trial court was required to instruct the jury on the law pertaining to that issue even though the appellant had not requested it to do so.

It may be suggested, because the court in its instruction 26 stated "Homicide is deemed justifiable, under the statutes of Kansas, when committed by any person in any one of the following cases," and then quoted pertinent portions of G. S. 1935, 21-404, that the requirements of 62-1447 were satisfied in the absence of a request for further and additional instructions on the subject therein mentioned. Not so. Under our decisions the law of self-defense cannot be presented, illustrated and applied all at once in a single statement. (*State v. Keehn*, 85 Kan. 765, 118 Pac. 851 and *State v. Schwenk*, 101 Kan. 408, 412, 167 Pac. 743.)

In conclusion it should perhaps be stated the fact the law of self defense was referred to in the manner heretofore mentioned is a further and additional reason why we are convinced this simple colored woman is entitled to a new trial. Prior to the giving of instruction 26 the court had painstakingly charged the jury not only as to the crime of murder but as to all lesser offenses of which she might be found guilty and at the close of each instruction quite properly stated that if from the evidence it found the defendant had committed the crime therein described it was its duty to find her guilty of that particular crime, but when it came to instruction

26 nothing was specifically stated as to its duty in the event it found facts warranting a verdict of justifiable homicide. We realize that omission was due to the court's theory there was no evidence as to self-defense. Nevertheless, under such conditions the jury may have construed the instructions in toto as limiting its deliberations as to guilt to the single question of whether the deceased was killed by the appellant or by the deceased's own sister. If so, the practical result was the jury considered it had been instructed to return a verdict of guilty if and when it found the appellant had struck the blow resulting in death and she was deprived of the fair and impartial trial by jury guaranteed her under the provisions of our constitution.

Other errors are urged by appellant but since she practically concedes no one of them standing alone was so serious as to justify a reversal of the judgment, and the one already decided gives her the relief she seeks, they will not be discussed or considered.

The judgment is reversed with instructions to grant a new trial.