No. 59,793

STATE OF KANSAS, *Appellee*, v. LAWONNA R. HILL, *Appellant.*

(744 P.2d 1228)

Opinion filed October 30, 1987.

*Benjamin C. Wood*, chief appellate defender, argued the cause and was on the brief for appellant.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Clark V.*

*Owens*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal in which the defendant, Lawonna R. Hill, was tried before a jury and convicted of second-degree murder. K.S.A. 21-3402. She was sentenced to a term of imprisonment of 15 years to life.

At approximately 3:00 a.m. on February 1, 1986, the Wichita Police Department began to receive reports of a shooting at 9th and Washington in Wichita, Kansas. At the same time, the defendant arrived at the Wichita police station. She told police officers there that she was the one who had done the shooting. Police officers responding to the reported scene of the shooting found a black female lying upon the floor in the hallway of a private club. The victim of the shooting, Patricia A. Jackson, was pronounced dead at the scene by members of the Sedgwick County coroner's office. The cause of death was a gunshot wound to the chest.

The defendant turned over to the police the gun used in the shooting, a .22 caliber pistol. Police officers informed defendant of her *Miranda* rights and she consented to interrogation by the police. Immediately prior to the interrogation, police officers informed her that Jackson had died. The police officer conducting the interrogation stated that defendant "gasped and weeped [*sic*] . . . for a period of time" in apparent "sorrow or shock." The tape recording made of the interrogation formed almost the entire basis of the State's case.

During the course of the interrogation, the defendant stated that she, along with her brother, Keith Hill; Keith's friend, Dana Love; and defendant's friend, Linda Maples, were at another bar near the scene of the shooting. The defendant, her brother, and Dana Love had arrived at Loffers, the other bar, at approximately 12:30 a.m. Maples was present at Loffers when the defendant arrived. The four stayed until closing at Loffers. Defendant stated during the interrogation that she had not had anything to drink during that time, although she had smoked a joint of marijuana earlier in the evening after she had gotten off work. After Loffers closed, defendant stated that the four proceeded to

a nearby bar which was still open, which has been referred to in the record variously as Tom's place or Rick's place. Upon arriving, they found the bar was crowded. As defendant went through the door, there was a lot of pushing and shoving. She described the events which followed:

"Hill: . . . So this girl, I don't know, I guess . . . the girl, the girl. Well, it was, you know, it was kind of pushing and I wasn't really paying no attention, you know. It was kind of pushing and then she hit me.

"Blevins: How did she hit you?

"Hill: I don't know. She, you know, she hit me. I was, we was going through the door and we kind of stopped right there where her and this guy was. So she hit me like on top of the head and my girlfriend said, Angel, she said go on—that's my nickname—Angel. She said, Angel go on, don't pay no attention 'cause she's drunk. So we was going on through, you know, and so I guess the shoving and pushing started again. So there she was again. . . .

. . . .

". . . I was walking on and she kinda, I guess, elbowed me again, and I turned around and I don't know what she was doing, 'cause I couldn't see her hands. You know, I couldn't see her hands. And it was dark, it was dark there. You know, and I couldn't see her hands, so I didn't know what the girl had. If she had anything. I don't know if she had a purse. I couldn't . . . I know I couldn't see her hands.

. . . .

"I said, I'm sick of this shit. I think I said I'm sick of this shit, I'm tired of this shit, I'm tired of this pushing or something. I said something. I don't know, I turned around, you know, and she did something. I think she kind of pushed me to get my attention, I don't know, and I turned around. You know, I couldn't see her hands 'cause it was dark. And evidently she didn't see mine, either. And that's all.

"Blevins: Did you get your gun out of your purse?

"Hill: Right. I just reached in there and got it, you know. I didn't . . . (unintelligible). I was minding my own business. I don't bother nobody. . . .

. . . .

"[Blevins]: . . . How many times did you fire it?

"Hill: It had to be once. I only fired one.

"Blevins: Just one time?

"Hill: It had to be.

"Blevins: How far away from her was you, do you think, when you shot at her?

"Hill: I don't know. I know I could see her in my face, you know. 'Cause she was right in my face.

. . . .

"Blevins: Okay. Why did you pull the gun out?

"Hill: I don't know. I couldn't see the girl's hands, for one thing. And I know she had this guy with her for another. And like the guy, I don't know, I think he was behind her, I don't know. I didn't see him; I know I didn't see him. I think . . . evidently he must have been behind her. I don't know where her

hands went. That's the main thing; I didn't know where her hands went 'cause I couldn't see her hands 'cause it, you know, 'cause it's so dark in there and I couldn't see her hands.

. . . .

"Blevins: Do you remember what she said?

"Hill: She says, I don't know if she called me a bitch or . . . I don't . . . She, she said something to me and she triggered me. You know, she said something. And I couldn't see her hands, you know.

"Blevins: She said something to make you mad, that . . .

"Hill: Well, yes, she . . . 'cause, you know, I had to turn all the way around, you know. I wasn't gonna leave my back to her. Ain't no way. And I couldn't see her hands. And the guy, you know. I don't know if the guy was behind me or in front of me. I don't know, he was a guy with her. She says, she said something to me. 'Cause I was going on; we was going on in the door. You know, I wasn't thinking about this girl.

"Blevins: She said something to . . . to trigger you and then you got . . . reached in and got your gun?

"Hill: Yeah, because I couldn't see her hands. I mean she said something. What she said, I don't remember."

At the trial, Keith D. Hill, defendant's brother, testified that he, his sister, and Dana Love left his sister's house at approximately 11:00 to 11:15 p.m., and went to Loffers. Keith Hill testified that his sister did not have anything to drink at Loffers. After Loffers closed, the three decided to go next door to Rick's place. Accompanying the three was Linda Maples, the defendant's friend, whom the three had met at Loffers.

According to Keith Hill's testimony, at Rick's place, people "were pushing and shoving, trying to get in. People were trying to get out." There were approximately 20 to 25 people pushing back and forth in the small hallway at the entrance to Rick's place. In the hallway, a woman told defendant, "Bitch, you pushed me." Defendant told the woman, "If I did, I'm sorry." The woman responded, "Bitch, that ain't it." Keith Hill testified that "[t]hey just went on" and his sister "kept on apologizing. The next thing I saw [Jackson's] hand raised up and the next thing I know the gun went off." Keith Hill testified that Jackson had raised her hand like she had something in it with which she was trying to hit his sister. Keith Hill testified that he was unable to see if anything was actually in Jackson's hand because it was too dark and there were too many people in the crowded hallway. Keith Hill also testified that, prior to the shooting, Jackson had struck the defendant.

Dana L. Love also testified that there was a good deal of pushing and shoving in the hallway in Rick's place. Love testified that it was very dark in the hallway, and too crowded for the number of people who were in it. One woman in the hallway called defendant a bitch and accused defendant of pushing her. Love testified that defendant told the woman, "if I pushed into you, I'm sorry." Love testified that the defendant "was trying to apologize to the girl and evidently apologizing wasn't enough." Love testified that Jackson was angry, and told defendant, "You bitch. You know you pushed me. You know you did, bitch." Love testified that he then saw the girl "rear back like she had something in her hand, coming toward" defendant. Love testified that Jackson came running at defendant with her hand raised. It was too dark to see if anything was, in fact, in Jackson's hand.

Linda Maples testified that there were approximately 30 to 40 people in the hallway in the entrance to Rick's place. Jackson was "coming out [of] the place and she was shoving everybody to get out." Maples testified that it was very dark in the hallway. However, Maples was able to see Jackson push and shove the defendant. Jackson struck defendant's head with her fist. Maples told the defendant to ignore Jackson, because Jackson was drunk. Maples testified that, immediately before the shooting, Jackson raised her hand toward defendant, and that Jackson had something in her hand but, because of the darkness, Maples was unable to see what the object was.

The defendant testified on her own behalf. She testified that, on the night of the shooting, she had worked until approximately 9:30 p.m. On her way to work, she picked up her gun from her mother's house. Defendant testified that she had left the gun at her mother's because she didn't want it around her children at home, but had decided to retrieve it when she was told of prowlers near her house. Defendant testified that, when she picked up the gun from her mother's, she did not know the gun was loaded. She placed the gun in her purse and then went home, where she met her brother, Keith Hill, and Dana Love. At their suggestion, she took them to Loffers at 9th and Washington in Wichita.

At Rick's place, there was a line of people in the hallway at the

entrance. The hallway was very dark and crowded. The defendant saw Jackson and a male companion standing next to a wall. There was a "lot of pushing and shoving." Jackson told defendant, "Damn, you spilled a drink. A drink got on me." Jackson also struck defendant on the side of the head. More pushing and shoving followed. The people in the hallway were cursing and hollering. Someone pushed defendant from behind, and she turned around to discover it was Jackson, the same woman who had hit her earlier. Jackson was cursing, and "her eyes kind of lit up, you know, like normal people, they wouldn't look like that." Defendant was scared and nervous. Jackson had said something which the defendant was unable to remember, but she remembers that she was scared by the tone of Jackson's voice. The defendant testified that she could not see Jackson's hands. She testified that she fired her pistol, but cannot remember the act of shooting. Defendant was scared for her life, and testified that she could see Jackson coming at her, and that she had acted in self-defense only.

The defendant first contends that the trial court erred by refusing to instruct the jury upon the lesser included offenses of voluntary manslaughter (K.S.A. 21-3403) and involuntary manslaughter (K.S.A. 1986 Supp. 21-3404).

A trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. K.S.A. 1986 Supp. 21-3107(3); *State v. Bishop*, 240 Kan. 647, 654, 732 P.2d 765 (1987). Instructions on lesser included offenses must be given even though the evidence supporting those offenses may not be strong or extensive. *State v. Roberson*, 210 Kan. 209, 499 P.2d 1137 (1972). An instruction on lesser included offenses should be given even if the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. Staab*, 230 Kan. 329, 339, 635 P.2d 257 (1981).

In *State v. Buffington*, 66 Kan. 706, 710, 72 Pac. 213 (1903), this court said:

"The unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court so to instruct."

However, if there is no evidence by which the jury might reasonably convict the defendant of the lesser included offense,

the instruction need not be given. *State v. Gregory*, 218 Kan. 180, 183, 542 P.2d 1051 (1975). An instruction is also unnecessary where the defendant's testimony precludes a conviction for the lesser offense. See *State v. Burrow & Dohlmar*, 221 Kan. 745, 561 P.2d 864 (1977); *State v. Wilson*, 215 Kan. 437, 439-40, 524 P.2d 224 (1974).

In *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 (1985), this court, in summarizing the basic principles of law applicable to voluntary manslaughter, said, in part:

"(2) 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection. *State v. Jones*, 185 Kan. 235, Syl. ¶ 2, 341 P.2d 1042 (1959); *State v. McDermott*, 202 Kan. 399 [,449 P.2d 545, *cert. denied* 396 U.S. 912 (1969)]; *State v. Ritchey*, 223 Kan. 99, [Syl. ¶ 2,] 573 P.2d 973 (1977); *State v. Coop*, 223 Kan. 302, 573 P.2d 1017 (1978).

. . . .

"(5) Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. 2 Wharton's Criminal Law § 156. . . .

"(6) An assault or battery resulting in a reasonable belief that the defendant is in imminent danger of losing his life or suffering great bodily harm may be of sufficient provocation to reduce the killing to voluntary manslaughter. 2 Wharton's Criminal Law, § 158."

We must apply these standards to the present case to determine if the court should have instructed the jury on voluntary manslaughter. In so doing, we must view the evidence in a light most favorable to the defendant. *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987).

There is evidence in the record that Jackson struck defendant's head and elbowed and pushed her. Jackson repeatedly used abusive and insulting words toward the defendant. Immediately before the shooting, the defendant could see Jackson coming at her in the dark hallway, and believed that Jackson was about to attack her. In *Guebara*, we noted that insulting words when accompanied by an assault may be sufficient provocation. 236 Kan. at 797. There is evidence in the record in the present case of both physical assault and abusive and insulting language. The issue is not whether such evidence convincingly establishes that defendant acted under adequate provocation. The issue is

whether there was some evidence, however weak and inconclusive, by which a reasonable jury might have convicted the defendant of voluntary manslaughter.

The State cites several cases in support of its position that no instruction was required. We find no support in these cases for the State's position. The first case is *State v. McDermott*, 202 Kan. 399, 449 P.2d 545, *cert. denied* 396 U.S. 912 (1969), in which the victim of the defendant did not initiate any violent acts. Rather, the victim was resisting the defendant's attempts to force her into his car. 202 Kan. at 400. There were no insults or other provocations directed at the defendant. Moreover, the court stressed that the defendant had testified that "he was not mad or angry at the time" of the shooting. 202 Kan. at 402. There was, thus, in *McDermott*, no evidence supporting either the conclusion that the victim had independently provoked the defendant or the conclusion that the defendant was provoked in fact.

In the second case, the State cites *State v. Stafford*, 213 Kan. 152, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974), in which the decedent victim had struck the defendant, knocking her glasses off.

"[T]he blow did not bruise or hurt her; she then squirted him in the face with a paralyzer spray from a pressurized can; this dazed him and as he was trying to rub the spray out of his eyes she wrapped the cord from the electric tea kettle around his neck and choked him with it; she grabbed him by what little hair he had on his bald head and threw him against the wall; she then threw him down on the floor and got astraddle of him with her knees on his arms; [the victim] was whimpering, saying 'Why are you doing these things to me'. Appellant stated . . . 'This really pissed me off'. Continuing, she said she picked up a hammer which was near the refrigerator and hit him with it three or four times." 213 Kan. at 154.

The victim eventually died by strangulation. In deciding that an instruction on voluntary manslaughter was not required, this court stressed that there was no evidence of adequate provocation at the time the victim was killed, and stressed the helpless condition of the victim at the time of his death. This court stated that, "although there was some evidence of prior quarreling and even of a blow being struck by the decedent, we believe insufficient provocation existed to reduce to voluntary manslaughter the eventual strangulation of one flat on his back in a disabled condition." 213 Kan. at 166.

Finally, the State is correct that, in *State v. Coop*, 223 Kan. 302, 573 P.2d 1017 (1978), a "violent drunken quarrel" existed prior to the killing of the victim, the defendant's wife. However, the defendant's testimony indicated clearly that the violence existed solely on the part of the defendant husband. The defendant testified that he had a "disagreement" with his wife in the front room of their house. However, not only was there no evidence of violence or provocation on the part of the decedent victim, but also, as in *McDermott*, the defendant precluded by his testimony the conclusion that he was actually provoked by any actions of the decedent.

In each of these cases, there was insufficient legal provocation by the decedent victim to justify an instruction on voluntary manslaughter. In both *McDermott* and *Coop*, the only acts of violence were initiated by the defendant. In *Stafford*, the victim had struck the defendant, but at the time of the victim's death the victim was prone and helpless upon the floor. There is no evidence in any of these three cases that, at the time of the victim's death, the victim provoked the defendant's actions.

In the present case, there was evidence that the defendant, immediately prior to the shooting, had been physically assaulted and insulted by the victim. We find that the refusal of the district court to instruct the jury on voluntary manslaughter was error.

The defendant also contends that the district court should have instructed the jury upon the lesser included offense of involuntary manslaughter. Involuntary manslaughter is defined in K.S.A. 1986 Supp. 21-3404(a):

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner."

This court paraphrased the requirements of involuntary manslaughter in *State v. Gregory*, 218 Kan. at 183:

"[Involuntary manslaughter] requires (1) an unintentional killing without malice; *and* (2) that it occur while the defendant was *either* (a) committing some misdemeanor *or* (b) performing some lawful (*i.e.*, not criminal) act in a manner which, in turn, was either (*i*) unlawful or (*ii*) wanton."

In *Gregory*, this court held that the trial court was justified in

submitting an involuntary manslaughter instruction to the jury, since there was sufficient evidence in the record that a jury might reasonably convict the defendant of that offense. This court said:

"[I]n repelling an attack one is limited to 'that force which *reasonably appears to be necessary* for that purpose.' (*State v. Stokes*, 215 Kan. 5, 523 P.2d 364, Syl. ¶ 4. See also, *State v. Blocker*, 211 Kan. 185, 192, 505 P.2d 1099.) If the jury had found the deadly force employed by Gregory was 'reasonably necessary' to repel Fullard's attack, it would have acquitted him. But if it found that force was excessive what could its verdict be? If it found no malice, it could not convict of murder. If it credited Gregory's testimony that he did not intend to kill, it could not convict of voluntary manslaughter. Yet the use of excessive force eliminated the statutory justification for the homicide and made it unlawful. Still, it did not in itself constitute the misdemeanor 'unlawful act' under the involuntary manslaughter statute because by definition that would have to be an act 'prohibited' by statute or ordinance. There is, however, another solution to the jury's dilemma. We think the jury could conclude on the facts of this case that Gregory had a right of self-defense, and his exercise of that right was a lawful act. It could also find, however, that shooting Fullard was not reasonably necessary—after all, his knife was not open when found. This use of excessive force could be found to be an 'unlawful manner' of committing the lawful act of self-defense, and thus supply that requisite element of involuntary manslaughter." *State v. Gregory*, 218 Kan. at 185-86.

In *State v. Childers*, 217 Kan. 410, 416, 536 P.2d 1349 (1975), this court found that the defendant's testimony that he was only trying to scare the victim, and had no intention of killing the victim, was sufficient to require an instruction on involuntary manslaughter, even though the State had presented "a strong case" to support the charge of second-degree murder and the defendant's testimony was "partially inconsistent."

In the present case, viewing the evidence in the light most favorable to the defendant, the jury could have concluded that the defendant unintentionally killed Jackson while defending herself, but used unreasonable and excessive force in so doing. A jury might also have concluded that the defendant might have unintentionally killed the victim by acting in a wanton manner, although not acting in self-defense. The defendant had a right to have the jury instructed on involuntary manslaughter, since there appears sufficient evidence in the record by which a jury might reasonably convict the defendant of such an offense, "however weak, unsatisfactory or inconclusive" the evidence

may appear to the court. *State v. Buffington*, 66 Kan. at 709. The refusal of the trial court in the present case to instruct the jury on involuntary manslaughter was error.

We next consider defendant's contention that the district court erred by refusing her requested instruction on self-defense. The right of self-defense is defined by K.S.A. 21-3211:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The circumstances under which a defendant is entitled to an instruction on self-defense are discussed in *State v. Childers*, 222 Kan. 32, 563 P.2d 999 (1977). In *Childers*, this court stated that, "in order to rely on self-defense as a defense, a person must have a belief that the force used was necessary to defend himself and, also, show the existence of some facts that would support such a belief." 222 Kan. at 48. In determining whether there is evidence that the defendant believed that force was necessary to defend himself, " 'it is well to remember the test is not how much but is there any.' " 222 Kan. at 49 (quoting *State v. Smith*, 161 Kan. 230, 237, 167 P.2d 594 [1946]). It is the duty of the trial court to instruct the jury on self-defense so long as there is any evidence tending to establish self-defense, although the evidence may be slight and may consist solely of the defendant's own testimony. *State v. Smith*, 161 Kan. at 237.

The defendant cites the case of *State v. Kelly*, 131 Kan. 357, 291 Pac. 945 (1930), in support of her argument that the trial court erred by refusing an instruction on self-defense. In *Kelly*, the defendant was convicted of second-degree murder and, on appeal, argued that the trial court's instructions on self-defense were incorrect statements of the law. The defendant had killed the victim, his wife's lover, by shooting him through the heart with a shotgun. At the time of the shooting, the victim and the defendant were alone, and the sole evidence supporting the assertion of self-defense was the testimony of the defendant. This court stated that the defendant had woven self-defense into his story at trial and, upon his request for an instruction relating to self-defense, "the court was obliged to instruct the jury on that subject." 131 Kan. at 361.

Here, during the course of the taped interrogation between defendant and police officers made within hours after the shooting, the defendant stated some fifteen times that she could not see Jackson's hands, and that she was afraid Jackson "was gonna jump on me."

Immediately before the shooting, the defendant had been insulted and assaulted by Jackson. The defendant stated immediately after the shooting that she believed that Jackson was preparing to attack her. The issue is not whether it is probable or even likely that the defendant was, in fact, acting in self-defense. The issue is whether there is any evidence supporting defendant's statement that the force she used was necessary to defend herself. Because, viewing all the evidence in the record in the light most favorable to the defendant, there is some evidence of physical aggression on the part of Jackson, and some evidence of a fear of assault on the part of the defendant, an instruction on self-defense should have been given.

The defendant next argues that three of the photographic exhibits admitted into evidence were unduly repetitious, gruesome, and added nothing to the State's case and, therefore, should not have been admitted. Exhibit 4 is a color photograph taken from the outside of the bar, looking into the entrance hallway. Exhibit 5 is taken from the inside of the hallway, looking in the opposite direction. Both exhibits show the supine body of Patricia Jackson from opposite directions. In both photographs there is blood on Jackson's face, her jacket, and on the floor. Exhibit 10 is a color photograph, looking downwards from above at the head and upper chest of Jackson. The photograph shows a considerable amount of blood around Jackson's mouth, and upon her jacket and the floor.

Photographs are admissible so long as they are true reproductions of relevant facts and conditions material to matters in issue, and the decision to admit such photographs lies within the broad discretion of the trial judge. *State v. Ruebke*, 240 Kan. 493, 516, 731 P.2d 842 (1987). Photographs are inadmissible where they are unduly repetitious, gruesome, and without probative value. *State v. Dargatz*, 228 Kan. 322, 329, 614 P.2d 430 (1980).

The photographs in the present case are similar to those

discussed in *State v. Bell*, 239 Kan. 229, Syl. ¶ 7, 718 P.2d 628 (1986), where we held:

"The law is well settled in this state that in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome."

The district court did not abuse its discretion in admitting into evidence Exhibits 4, 5, and 10. See *State v. Hollis*, 240 Kan. 521, 533-34, 731 P.2d 260 (1987), and cases cited therein.

The defendant next contends that Sedgwick County District Court Judge Robert D. Watson's conduct during the trial prejudiced her right to a fair trial. The defendant cites three instances in which she alleges that Judge Watson failed to remain impartial. The first instance occurred during the opening statement by counsel for the defendant. The second alleged instance of partiality occurred at the trial during the testimony of Linda Maples. The final instance of alleged misconduct on the part of the trial judge occurred during the testimony of another defense witness, Jonathon Preston Shaffer, who was present at the scene of the shooting.

We recently discussed the standards relevant in the consideration of whether a trial judge's alleged partiality has deprived a defendant of his right to a fair trial in *State v. Hamilton*, 240 Kan. 539, 731 P.2d 863 (1987). With these standards in mind, we have reviewed the record as to the three alleged instances of misconduct and, although some of the cited comments by the court were unnecessary or improper, we conclude that there was no unnecessary criticism directed at the defendant, or any comments on the strength of the defendant's case. What statements were made by the trial judge appear generally to reflect only upon defendant's trial counsel. We do not find the statements of such gravity that they deprived the defendant of a fair trial.

The defendant next contends that the district court improperly excluded expert testimony to the effect that she suffered from a diminished capacity. The defendant sought to introduce the testimony of Dr. Howard Brodsky for that purpose. The State objected to the testimony on the grounds that the crime for which the defendant was charged, second-degree murder, was not a specific intent crime and, therefore, evidence of diminished

capacity was inadmissible. The State also argued that the testimony of Dr. Brodsky was a surprise. The district court ruled that Dr. Brodsky's testimony was inadmissible on the grounds that, as a general intent crime, evidence of diminished capacity is inadmissible in cases involving second-degree murder. Counsel for defendant then introduced Dr. Brodsky's report into the record as a proffer.

In *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368 (1986), we said:

"The admission of such evidence for the limited purpose of a partial defense against the specific intent of the crime is the doctrine of diminished capacity or—as designated in many jurisdictions—diminished or partial responsibility. In Lewin, *Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity*, 26 Syracuse L. Rev. 1051, 1060 (1976), Professor Travis Lewin discussed the scope of the partial responsibility defense:

" 'Partial responsibility is a defense only in specific intent cases. Specific intent crimes are those in which, as one of the essential elements of the offense, the prosecution must prove beyond a reasonable doubt that the defendant entertained a specific objective or engaged in certain specified mental activity. Examples of specific intent crimes range from aggravated homicides requiring proof of premeditation, deliberation and a design to effect death, through larceny offenses which require proof that the defendant intended to permanently deprive an owner of personalty of his right to possession, to conspiracy, attempted crimes and all offenses based upon accessorial liability. If for any reason the defendant did not entertain the particular mental state, then he did not commit that crime, although he may, of course, have committed some other or lesser crime not requiring that particular state of mind.'

"Thus, it is apparent we have adopted the doctrine of diminished capacity in spite of our past disclaimers. Evidence of diminished capacity is admissible only for the limited purpose of negating specific intent and is not a substitute for a plea of insanity." 238 Kan. at 798.

See also *State v. Maas*, 242 Kan. 44, 744 P.2d 1222 (1987) (recommended instruction on diminished capacity formulated by Supreme Court).

The State contends that second-degree murder is not a specific intent crime, citing *State v. Egbert*, 227 Kan. 266, 267, 606 P.2d 1022, *cert. denied* 449 U.S. 965 (1980). Our decision in *Egbert* does not support the State's contention.

In *Egbert*, we did not rule that intent to kill is not a necessary element of second-degree murder but, rather, that the instructions given to the jury in *Egbert*, taken as a whole, were not misleading. We noted that the district court had instructed the

jury that it must find that the defendant had killed the victim maliciously. The trial court had further, in its instructions to the jury, defined maliciously pursuant to PIK Crim. 56.04 as "willfully doing a wrongful act without just cause or excuse." 227 Kan. at 267. The trial court then also defined "willfully" as "conduct that is purposeful and intentional, and not accidental." 227 Kan. at 267. This court stated that it was not necessary for the trial court to assemble all the instructions in the case into one, and further stated that the instructions in the case, given a fair reading as a whole, would not have misled the jury as to the requirements of second-degree murder.

In *State v. Childers*, 222 Kan. 32, the defendant was also convicted of second-degree murder. The defendant argued that, while he had intentionally shot the victim, he then proceeded to "point out the distinction between intentional shooting and intentional killing, and that *the statute requires intentional killing.*" (Emphasis added.) 222 Kan. at 36. We stated: "Defendant's analysis of the elements of second degree murder is correct." 222 Kan. at 36.

In *State v. Seelke*, 221 Kan. at 678, we held:

"In some cases the evidence presented at the trial has tended to show some provocation or mitigating circumstances providing an explanation for the killing or raising a legitimate issue as to whether the defendant had the intention to kill the decedent. An intent to kill is a necessary element of murder in the first degree (K.S.A. 21-3401 [1]), murder in the second degree (K.S.A. 21-3402) and voluntary manslaughter (K.S.A. 21-3403)."

Second-degree murder is defined in K.S.A. 21-3402: "Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration or attempt to perpetrate a felony." The term "malicious" is a specific designation of the intent which a defendant must possess in killing a human being to be found guilty of murder in the second degree. The term "malicious" has been defined as "willfully doing a wrongful act without just cause or excuse." *State v. Egbert*, 227 Kan. at 267; *State v. Wilson*, 215 Kan. 437, Syl. ¶ 2, 524 P.2d 224 (1974); *State v. Jensen*, 197 Kan. 427, 417 P.2d 273 (1966); PIK Crim. 2d 56.04(a), Homicide Definitions. See K.S.A. 21-3201(1). "Willful" conduct is defined as "conduct that is purposeful and intentional and not acciden-

tal." K.S.A. 21-3201(2); *State v. Osburn*, 211 Kan. 248, 254, 505 P.2d 742 (1973); PIK Crim. 2d 56.04(c). The State's assertion that an intent to kill was not required under Kansas law in cases involving second-degree murder is not supported by statute or case law. The requirement of an intent to kill is contained within the express requirement of second-degree murder that the defendant had acted "maliciously" in killing a human being.

The district court's conclusion that second-degree murder is not a specific intent crime is incorrect, and the district court erred in excluding the testimony of Dr. Brodsky.

Finally, defendant argues that the district court erred in submitting a presumption of intent instruction to the jury. The argument is without merit. The defendant's position has been consistently rejected by this court. See *State v. Ransom*, 239 Kan. 594, 604-06, 722 P.2d 540 (1986).

The judgment of the district court is reversed and the case is remanded for a new trial.